Roy M. HENRY, et al., Appellants,

v.

William K. HALLIBURTON,
Respondent.

No. 66335.

Supreme Court of Missouri,
En Banc.

May 29, 1985.

P. Terence Crebs, Joseph J. Simeone, Richard J. Pautler, St. Louis, for appellants.

D. Raymond Raney, John J. Horgan, St. Louis, for respondent.

WELLIVER, Judge.

This case involves a defamation action brought by appellants, Roy M. Henry and St. Louis Financial Planners, Inc., against respondent William K. Halliburton.[1] Respondent moved to dismiss the petition for failure to state a cause of action upon which relief can be granted. The trial court sustained the motion and dismissed the petition. The court of appeals affirmed. The cause was certified to this Court by a dissenting judge pursuant to Rule 83.01. We affirm.

## I

Both appellants and respondent were engaged in the business of selling life insurance. Two of appellants' prospective customers were informed by Hazel Kohring that appellant, Roy M. Henry, was a "crook." These customers then requested from respondent an article which they apparently were told concerned appellant and which formed the basis for Hazel Kohring's statement.[2] Respondent wrote the column entitled "Believe It-Or Not"[3] as his President's Message in "Life Notes," a publication of Life Underwriter's Association of St. Louis, Inc. Appellants' petition alleges that a copy of this article was mailed to these two customers, and that the article alleged that "a certain insurance agent and general agent had acted with 'greed' for the purpose of 'fleecing a consumer for their [the agent's] own personal gain,' and that said general agent was a fraud and a twister."[4] Appellants claim that respondent knew such statements were false and defamatory and were made for the purpose of dissuading the two customers from purchasing life insurance from appellants and for the purpose of damaging appellants' business reputations. The petition alleges special damages in the sum of $400 resulting from the lost sale of insurance and seeks $10,000 for damages sustained to appellants' business reputations.[5] The petition further requests punitive damages claiming that the respondent acted "willfully and maliciously, and for the purpose of vexing, annoying and harrassing the [appellants] and for the pur-

1. Appellants' amended two count petition also sought relief against Hazel Kohring who is respondent's partner and mother. The claim against her was dismissed by stipulation of the parties. No words used by the mother are at issue in this case nor is there any allegation of respondeat superior.

2. In the brief before the court of appeals, appellants explain that one of the prospective purchasers called respondent on the telephone and asked him to send a copy of the article that he had previously written.

3. The full text of the column appears in Appendix A to this opinion.

4. Appellants' brief before the court of appeals also claims that respondent called appellant Henry a "crook." However, no such statement was alleged in the petition.

5. Although we need not decide the question, it might be noted that it is not altogether clear that the petition is sufficient to make appellant St. Louis Financial Planning, Inc., a proper plaintiff. Compare R. Sack, Libel, Slander, and Related Problems 125 (1980) with Restatement (Second) of Torts, § 561. See also W. Prosser & W. Keeton, Prosser and Keeton on the Law of Torts 779 (1984).

pose of destroying the business reputation of the [appellants]."

Respondent moved to dismiss the petition, claiming that the alleged defamatory remarks were expressions of opinion and thus constitutionally barred from becoming the subject of a defamation action. The court of appeals affirmed the dismissal, stating in effect that all opinions are constitutionally privileged, even if falsely and insincerely held, as long as the facts supporting the opinion are set forth so that a reader could draw his or her own conclusion. While we believe the court of appeals reached the correct result, the importance of the issue requires a more detailed consideration of the matter.

## II

The complexity of the law in this area requires that we first examine certain general principles governing the common law of defamation before addressing the protections afforded by the First Amendment.

At common law, causes of action for libel and slander developed to protect an individual against harm to his or her reputation. L. Eldridge, The Law of Defamation 2 (1978); W. Prosser & W. Keeton, *supra,* at 771 R. Sack, *supra,* at 1. Modern law includes these causes of action under the single tort of defamation,[6] while retaining many of the common law characteristics of each.[7] W. Prosser & W. Keeton, *supra,* at 771–73; Note, "Fact and Opinion After *Gertz v. Robert Welch, Inc.:* The Evolution of a Privilege," 34 Rutgers L.Rev. 81, 83 (1981). "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559. Courts in the first instance must determine whether a statement is capable of defamatory meaning and then the jury decides whether the words were so understood. W. Prosser & W. Keeton, *supra,* at 781. *See e.g., Davis v. Ross,* 754 F.2d 80, 82–083 (2nd Cir.1985); *Worley v. O.P.S.,* 69 Or.App. 241, 686 P.2d 404, 406 (1984); *Thomas Merton Center v. Rockwell Intern. Corp.,* 442 A.2d 213, 215 (Pa.1982), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351.

---

6. *See generally* W. Prosser & W. Keeton, *supra,* at 785–88. *But cf. Laux v. Motor Carriers Council of St. Louis, Inc.,* 499 S.W.2d 805, 808 (Mo. 1973).

7. Parties, for example, are often faced with the distinction between slander per se and slander per quod, with spoken words which are slanderous per se creating a presumption of harm to a plaintiff's reputation, and with words not within a slanderous per se category actionable only if the plaintiff proves special damages. *See Brown v. Kitterman,* 443 S.W.2d 146, 153 (Mo. 1969). Sometimes a plaintiff would have to plead and prove extrinsic facts to establish that the slanderous words were of and concerning the plaintiff. *Cook v. Pulitzer Publishing Co.,* 241 Mo. 326, 145 S.W. 480, 488 (1912). Similarly, in the law surrounding libel, courts draw a distinction between libel per se and libel per quod. *See e.g., Missouri Church of Scientology v. Adams,* 543 S.W.2d 776, 777 (Mo. banc 1976); *Langworthy v. Pulitzer Publishing Co.,* 368 S.W.2d 385, 388 (Mo.1963); *Greening v. Klamen,* 652 S.W.2d 730, 735 (Mo.App.1983); *Anton v. St. Louis Suburban Newspapers, Inc.,* 598 S.W.2d 493, 496 (Mo.App.1980). While we need not address the efficacy of these various distinctions, it might be noted that the weight of scholarly commentary calls for their abolition. *See generally* L. Eldridge, *supra,* at 92–95, 151–91;

R. Sack, *supra,* at 94–110. It may be that certain constitutional requirements render some of these distinctions no longer necessary. *See generally* Scott, "The New Libel and Slander Instructions: A Partial Federalization of Missouri Defamation Law," 37 J. of Mo. Bar 149 (1981). *See also Wilson v. Scripps-Howard Broadcasting Co.,* 642 F.2d 371, 375–76 (6th Cir.1981) (suggesting shift in burden of proving falsity).

It should be noted that the Missouri Constitution provides "that in all suits and prosecutions for libel or slander the truth may be given in evidence; and in suits and prosecutions for libel the jury, under the direction of the court, shall determine the law and the facts." Mo Const. art. 1 § 8. The purpose for this provision was that at common law the jury only decided the fact of publication and the judge determined guilt–especially in sedition cases. The constitutional provision was designed to wrest this power from the court and allow juries to acquit persons expressing critical or unpopular views. *See* T. Schroeder, Constitutional Free Speech, 158–59 (1919); Note, "The Impending Federalization of Missouri Defamation Law," 43 Mo.L. Rev. 270, 276 (1978); *Jacobs v. Transcontinental & Western Air, Inc.,* 358 Mo. 674, 216 S.W.2d 523 (1948).

■ The common law provides the defamation defendant with three general types of defenses. First, truth may always be asserted as an absolute defense. Mo. Const. art 1, § 8. Second, certain statements are absolutely privileged: for example, statements made during judicial proceedings.[8] Third, other statements receive a conditional or qualified privilege.

■ Two types of qualified privileges exist at common law. First, there is the doctrine of fair comment. The law is well-settled "that a newspaper has the right fairly and honestly to comment upon a matter of public interest." *Cook v. Pulitzer Publishing Co.*, 241 Mo. 326, 145 S.W. 480, 488 (1912). *See generally McClung v. Pulitzer Publishing Co.*, 279 Mo. 370, 214 S.W. 193 (banc 1919). This right of comment is limited to expressions of opinion honestly and fairly held and based upon truth. Questioning the motives of a public official often falls within the purview of the privilege. In *Warren v. Pulitzer Publishing Co.*, 336 Mo. 184, 78 S.W.2d 404 (1934), the Court explained:

> One also has the right (and this applies to a newspaper which is properly in the business not only of giving the public news but also of making them think about its significance) to comment upon true facts, when they are matters of public concern, by stating his inferences and conclusions about them. One may even be wrong in the inference he draws from true facts, which may be susceptible of more than one interpretation, and may even state such inferences critically and sarcastically and not be guilty of libelous defamation (36 C.J. 1283, § 287); but to stay within the field of this privilege, he must not state his conclusions as facts, unless they are true. 36 C.J. 1282, § 285. The right to comment or criticize means the right to draw inferences from facts, subject to the qualification that the facts are true; that the inferences are reasonable; and that they are made in

good faith and without malice. 36 C.J. 1279–1283, §§ 276–289. If facts and comments are stated in the same article, it should clearly show what are facts and what are merely the writer's conclusions therefrom.

*Id.* 78 S.W.2d at 413. Once the privilege attaches, the plaintiff can defeat the privilege upon proof that defendant abused the privilege. *Cook v. Pulitzer Publishing Co., supra,* at 492 (Kennish, J., on motion for rehearing). *See generally* Hallen "Fair Comment," 8 Tex.L.Rev. 41 (1929); Titus, "Statement of Fact versus Statement of Opinion—A Spurious Dispute in Fair Comment," 15 Vand.L.Rev. 1203 (1962); Veeder, "Freedom of Public Discussion," 23 Harv. 413 (1910); Note, "Fair Comment," 62 Harv.L.Rev. 1207 (1949).

■ Second, in addition to the privilege of fair comment a defendant can assert a qualified privilege if the statement was made under certain circumstances. "[A] publication made on an occasion which furnishes a prima facie legal excuse for the making of it; and which is privileged, unless some additional fact is shown which so alters the character of the occasion as to prevent it furnishing a legal excuse." *Lee v. W.C. Fuetterer Battery & Supplier Co.*, 323 Mo. 1204, 23 S.W.2d 45, (1929) (quoting Townshend on Slander and Libel (4th Ed. § 209)). The scope of the privilege generally encompasses:

> all statements made bona fide in performance of a duty, or with a fair and reasonable purpose of protecting the interest of the person making them, or the interest of the person to whom they are made. A communication made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter, which, without this privilege, would be slanderous and actionable. But in this definition

---

**8.** *See e.g., Pulliam v. Bond,* 406 S.W.2d 635 (Mo. 1966); *Westbrook v. Mack,* 575 S.W.2d 921 (Mo. App.1978).

of a privileged communication, the word "duty" cannot be confined to legal duties, which may be enforced by indictment, action, or mandamus, but must include moral and social duties of imperfect obligation. * * *

In 36 C.J. 1241, it is said: "qualified privilege exists in a larger number of cases than does absolute privilege. It relates more particularly to private interests; and comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, upon a subject matter in which the author of the communication has an interest, or in reference to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty. Briefly stated, a qualifiedly privileged communication is a defamatory communication made on what is called an occasion of privilege without actual malice. As to such communications there is no civil liability."

*Id.* Providing information at the request of the recipient, for the common interest of both the recipient and the declarant, or to protect an interest of the recipient establishes a qualified privilege. *See e.g., Ingber v. Ross,* 479 A.2d 1256, 1264 (D.C.App. 1984) (communication to prospective patient). See generally L. Eldridge, supra, at §§ 86–87; Note, "The Impending Federalization of Missouri Defamation Law," 43 Mo.L.Rev. 270, 282–85 (1978). Along with the privilege for fair comment, these other qualified privileges can be defeated upon a showing of express common law malice. *See e.g., Smith v. McDonald,* 737 F.2d 427 (4th Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 502, 83 L.Ed.2d 394; *Marck v. Johns Hopkins University,* 60 Md.App. 217, 482 A.2d 17, 21–22 (1984); *Bratt v. International Business Machines Corp.,* 392 Mass. 508, 467 N.E.2d 126, 131–32 (1984).

■ On the record before us, it would appear that respondent, having sent a copy of the column upon an unsolicited request, would be entitled to a conditional privilege under the common law. Appellants, however, plead what would amount to an abuse of the privilege, which they would assert defeats the conditional privilege. Respondent, nevertheless, seeks dismissal of the petition on the ground that the statements are covered by a constitutionally based *absolute* privilege for the expression of all opinions, regardless of the allegation of express malice. Appellants, in turn, argue both that the constitutional privilege applies only to media defendants and that the expressions were not opinions. We agree with appellants that respondent must be treated as a nonmedia defendant. The alleged defamatory remarks did not occur by reason of the original publication, but rather by reason of the article being sent privately to specific individuals. The threshold question which we must determine is whether a nonmedia defendant shall be accorded the same constitutionally based privilege as that accorded to media defendants.

Within the last two decades, the United States Supreme Court has recognized that concerns for freedom of speech and press require a more careful approach to the law of defamation. In cases beginning with *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court recognized that the common law of defamation was subject to certain First Amendment guarantees. There, the Court held that a public official must prove constitutional malice before he or she can recover for a defamation.[9] *See also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The case upon which respondent necessarily must rely is *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Gertz,* the Court delimited the

**9.** The Supreme Court held that a public official must prove "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan, supra,* at 279–80, 84 S.Ct. at 726.

permissible boundaries for a defamation action brought by a private party against a publisher or broadcaster. As long as the State does not impose liability without fault, a plaintiff may prevail if he or she establishes actual injury resulting from a defamatory falsehood.[10] *Id.* at 347, 94 S.Ct. at 3010. Important dicta in the opinion added another caveat to the law of defamation. In oft-quoted language, Justice Powell wrote:

> We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–40, 94 S.Ct. at 3007. This language has served as the genesis for the evolving principle that, at least in cases involving media defendants, expressions of opinion cannot be the subject of a defamation action.[11] The Supreme Court recently suggested that in some cases it might be necessary to distinguish between facts and opinions. *Bose Corp. v. Consumers Union of U.S., Inc.*, — U.S. —, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984). *See also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984); *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). Our courts of appeal already have held that opinions are not actionable. *Buller v. Pulitzer Publishing Co.* 684 S.W.2d 473, 479 (Mo.App.1984); *Anton v. St. Louis Suburban Newspapers, Inc.*, 598 S.W.2d 493, 498 (Mo.App.1980); *Iverson v. Crow*, 639 S.W.2d 118, 119 (Mo.App.1982). However, courts invoking this general principle have not had occasion to address whether the *Gertz* dicta should be applied to a private communication by a nonmedia defendant.

Whether expressions of opinion by a nonmedia defendant of and concerning a private party are constitutionally protected from a defamation action presents a novel issue. Dicta in *Anton v. St. Louis Suburban Newspapers, Inc., supra*, at 499, suggests that such opinions are actionable. *See also* Sustein, "Hard Defamation Cases," 25 William & Mary L.Rev. 891, 901 (1984); *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 59 (Fla.App.1981) (Smith, J., dissenting). Conversely, "[t]he American Law Institute takes the position that protection of private opinion is the logical extension of the *Gertz* dictum" and it has modified the Restatement (Second) of Torts to shield *all* expressions of pure opinion. *Kotlikoff v. The Community News*, 89 N.J. 62, 444 A.2d 1086, 1090, n. 3 (1982). Although the precise issue has not been addressed, the United States Court of Appeals for the District of Columbia best expresses the prevailing sentiment:

---

**10.** The Court in *Gertz* also discussed awarding punitive damages. *Gertz v. Robert Welch, Inc., supra*, at 348–50, 94 S.Ct. at 3011–12. It might be noted that some commentators suggest that punitive damages should not be allowed. *See e.g.*, Lewis, *"New York Times v. Sullivan* Reconsidered: Time to Return to 'the Central Meaning of the First Amendment," 83 Colum.L.Rev. 603, 617 (1983); Smolla, "Let the Author Beware: The Rejuvenation of the American Law of Libel," 132 U.Pa.L.Rev. 1, 92 (1983). *See also* Note, "Punitive Damages and Libel Law," 98 Harv.L.Rev. 847 (1985).

**11.** The United States courts of appeal have recognized the absolute privilege for the expression of an opinion. *See e.g.*, *Chow of New York v. Ste. Jour Azur*, 759 F.2d 219 (2nd Cir.1985); *Janklow v. Newsweek, Inc.*, 759 F.2d 644 (8th Cir.1985); *Davis v. Ross*, 754 F.2d 80 (2nd Cir. 1985); *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir. 1984); *Church of Scientology of California v. Flynn*, 744 F.2d 694 (9th Cir.1984); *National Foundation For Cancer Res. v. Council of B.B.D.*, 705 F.2d 98 (4th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 108, 78 L.Ed.2d 110; *Rinsley v. Brandt*, 700 F.2d 1304 (10th Cir.1983); *Street v. National Broadcasting Co.*, 645 F.2d 1227 (6th Cir.1981), *cert. granted*, 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 83, *cert. dismissed*, 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636; *Church of Scientology of California v. Cazares*, 638 F.2d 1272 (5th Cir.1981); *Avins v. White*, 627 F.2d 637 (3rd Cir.1980), *cert. denied*, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244.

[A]t common law, the fair comment doctrine bestowed qualified immunity from libel actions as to certain types of opinions in order that writers could express freely their views about subjects of public interest. However, since *Gertz v. Robert Welch, Inc.,* the nature of the accommodation [of the free expression of ideas with the common law's protection of an individual's interest in reputation] has fundamentally changed. In *Gertz,* the Supreme Court in *dicta* seemed to provide absolute immunity from defamation actions for all opinions and to discern the basis for this immunity in the First Amendment.

*Ollman v. Evans,* 750 F.2d 970, 974 (D.C. Cir.1984) (en banc). That court continued its observation by suggesting that *"Gertz* elevated to constitutional principle the distinction between fact and opinion, which at common law had formed the basis of the doctrine of fair comment. *Gertz's* implicit command thus imposed upon both state and federal courts the duty as a matter of constitutional adjudication to distinguish facts from opinions in order to provide opinions with the requisite, absolute First Amendment protection." *Id.* at 975. With little or no analysis, a number of commentators also presume that the *Gertz* dicta refers to all expressions that may be characterized as opinions.[12] Some courts, however, expressly avoid the question and suggest that the *Gertz* dictum constitutionalizes those opinions on matters of public concern that would have been privileged under fair comment.[13] *E.g., Kotlikoff v. The Community News, supra,* 444 A.2d at 1089–90. *See also Goodrich v. Waterbury Republican-American,* 188 Conn. 107, 448 A.2d 1317, 1324 (1982).

Our analysis consists of two separate lines of inquiry. First, should media and nonmedia defendants be treated differently when expressing an opinion? Second, should the protection afforded opinions be limited to certain subject matters, such as subjects traditionally within the realm of fair comment? To some extent, this requires that we enter uncharted waters. *See* Note, "Fact and Opinion After *Gertz v. Robert Welch, Inc.:* The Evolution of a Privilege," Rutgers L.Rev. 81, 124 (1981).

A

We do not believe that opinions lose their protected status *merely* because the declarant may be classified as a nonmedia defendant. The language in *Gertz* does not refer to media defendants; rather, Justice Powell's remarks appear to reflect a general observation governing the entire law of defamation. This seems especially clear in light of the fact that the observation appears to be unrelated to the facts of the case. Judge Friendly accurately noted that the language in *Gertz* has "become the opening salvo in *all* arguments for protection from defamation actions on the ground of opinion, even though the case did not remotely concern the question." *Cianci v. New Times Publishing Co.,* 639 F.2d 54, 61 (2nd Cir.1980) (emphasis added). *See also* R. Sack, *supra,* at 178–83; Brady, "Defamation Law of Wisconsin," 65 Marq. L.Rev. 505, 516 (1982). *But cf.* Hill, "Defamation and Privacy under the First Amendment," 76 Colum.L.Rev. 1205, 1239 (1976) (critical of Supreme Court's generalization).

Other factors militate in favor of granting an absolute privilege for the expression of—at least some—opinions by nonmedia

---

**12.** *See e.g.,* Franklin & Bussel, "The Plaintiff's Burden In Defamation: Awareness a Falsity," 25 William & Mary L.Rev. 825 (1984); Smolla, "Let the Author Beware: The Rejuvenation of the American Law of Libel," 132 U.Pa.L.Rev. 1, 67 n. 316, 88 (1983); Wade, "The Communicative Torts and the First Amendment," 48 Miss. L.J. 671, 698 (1977); Note, "Fact and Opinion After *'Gertz v. Robert Welch, Inc.,'*: The Evolution of a Privilege," 34 Rutgers L.Rev. 81 (1981); Note, "The Fact-Opinion Distinction in First

Amendment Libel Law: The Need for a Bright-Line Rule," 72 Geo.L.J. 1817 (1984).

**13.** Justices Rehnquist and White also have expressed some concern for the growing reliance on the dicta in *Gertz. Miskovsky v. Oklahoma Publishing Co.,* 459 U.S. 923, 924, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982) (denial of certiorari) (Rehnquist, J., dissenting).

defendants. Aside from the difficulty inherent in defining a media defendant,[14] it would be anomolous to hold the one who privately expresses an opinion liable but one who communicates the same opinion to a large number of persons through the media not liable. *See generally*, Eaton, "The American Law of Defamation Through *Gertz v. Robert Welch, Inc.* and Beyond: An Analytical Primer," 61 Va.L. Rev. 1349, 1418 (1975). *See also* Wade, "The Communicative Torts and the First Amendment," 48 Miss.L.J. 671, 699–700 (1977).

■ Additionally, the First and Fourteenth Amendments to the Federal Constitution not only protect the freedom of the press but also embrace the freedom of speech. First Amendment protection is not lost merely because the speech involves private individuals and private communications. *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). *See generally* Schauer, *"Private* Speech and the *Private* Forum: *Girhan v. Western Line School District,"* 1979 Sup.Ct.Rev. 217, 230. "The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of U.S., Inc.*, —— U.S. ——, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984). In Missouri this right is recognized by our State Constitution which expressly protects "the freedom of speech, no matter by what means communicated." Mo. Const. art. 1 § 8. It should be noted that even at common law, while the qualified privilege for fair comment could be defeated upon proper proof by the plaintiff,

courts seemed less concerned with the status of the declarant than with the subject of the statement. In the analogous area of defamation of public officials and public figures, the weight of authority indicates that the *New York Times* standard is not limited to media defendants. Eaton, *supra,* at 1406; Note, *"The Public Figure Plaintiff v. the Nonmedia Defendant in Defamation Law: Balancing the Respective Interests,"* 68 Iowa L.Rev. 517, 524, n. 56, 530 (1983). *E.g., Avins v. White*, 627 F.2d 637, 649 (3rd Cir.1980); *Davis v. Schuchat*, 510 F.2d 731, 734, n. 3 (D.C.Cir.1975). *See also New York Times v. Sullivan, supra,* 376 U.S. at 282, 84 S.Ct. at 727 (suggesting that citizen-critic afforded similar protection). *But cf. Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (avoided deciding the question). We are persuaded that in the interest of free speech and for the symmetry of defamation law the status of the declarant does not necessarily determine whether the·expression of an opinion is actionable.

### B

■ Having determined that media and nonmedia defendants should be treated equally when asserting the absolute privilege for the expression of an opinion, we must now examine whether the privilege is limited to only those matters of public importance that would have fallen under the conditional privilege for fair comment.

First Amendment theory provides different levels of protection by balancing the competing interests depending upon the character of the speech. The highest protection is accorded pure speech touching on matters of public importance.[15] The United States Supreme Court has stated:

> The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and

---

14. *See Greenmoss Builders, Inc. v. Dun & Bradstreet*, 143 Vt. 66, 461 A.2d 414, (1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 389, 78 L.Ed.2d 334. *See e.g., Geiger v. Dell Publishing Co., Inc.* 719 F.2d 515, 516 (1st Cir.1983).

15. *See generally F.C.C. v. League of Women Voters of California,* —— U.S. ——, 104 S.Ct. 3106, 3118, 82 L.Ed.2d 278 (1984); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980).

social changes desired by the people." "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the heirarchy of First Amendment values," and is entitled to special protection.

*Connick v. Meyers, supra,* 461 U.S. at 145, 103 S.Ct. at 1689. *See also Thornhill v. Alabama,* 310 U.S. 88, 101–02, 60 S.Ct. 736, 743–44, 84 L.Ed. 1093 (1940). The basis for this position is the theory of the "marketplace of ideas" espoused by John Stuart Mill and modified by Alexander Meiklejohn.[16] Meiklejohn advocated that:

> Its [the Amendment's] purpose is to give to every voting member of the body politic the fullest possible participation in the understanding of those problems with which the citizen of a self-governing society must deal. When a free man is voting, it is not enough that the truth is known by someone else, by some scholar or administrator or legislator. The voters must have it, all of them. The primary purpose of the First Amendment is, then, that all the citizens shall, so far as possible, understand the issues which

bear upon our common life. That is why no idea, no opinion, no doubt, no counter-belief, no relevant information, may be kept from them.

A. Meiklejohn, Free Speech: and Its Relation to Self-Government 88–89 (1948). This theory, perhaps more aptly described as a political process approach to the First Amendment, was implicit in the Supreme Court's decision in *New York Times v. Sullivan, supra,* where the Court reaffirmed that "debate on public issues should be uninhibited, robust, and wideopen." *New York Times v. Sullivan, supra,* 376 U.S. at 270, 84 S.Ct. at 721. *See generally* Brennan, "The Supreme Court and the Meiklejohn Interpretation of the First Amendment," 79 Harv.L.Rev. 1 (1965); Kalven, "The *New York Times* Case: A Note on the Central Meaning of the First Amendment," 1964 Sup.Ct.Rev. 191; Redish, "The Value of Free Speech," 130 U.Pa.L.Rev. 591, 640 (1982); Wade, *supra,* at 676. The theory developed during the decades surrounding World War I,[17] and a great deal of recent scholarly debate has focused on the efficacy of and proper boundaries for this view of the First Amendment.[18]

**16.** *See generally,* A. Meiklejohn, Political Freedom (1960); "The First Amendment Is an Absolute," 1961 Sup.Ct.Rev. 145.

**17.** *See generally* Rabban, "The Emergence of Modern First Amendment Doctrine," 50 U.Chi.L.Rev. 1205 (1983).

**18.** *See generally,* Baker, "Scope of the First Amendment Freedom of Speech," 25 U.C.L.A. L.Rev. 964 (1978); Baker, "Commercial Speech: A Problem in the Theory of Freedom," 62 Iowa L.Rev. 1 (1976); Bevier, "The First Amendment and Political Speech: An Inquiry Into Substance and Limits of Principle," 30 Stan.L.Rev. 299 (1978); Blasi, "The First Amendment and the Pathological Perspective," 85 Colum.L.Rev. 449 (1985); Bloustein, "The Origin, Validity, and Interrelationship of the Political Values Served by Freedom of Expression," 33 Rutgers L.Rev. 372 (1981); Bork, "Neutral Principles and Some First Amendment Problems," 47 Ind.L.J. 1 (1971); Emerson, "Toward a General Theory of the First Amendment," 72 Yale L.J. 887 (1963); Emerson, "The State of the First Amendment as We Enter '1984'," 2 Com.Law 3 (1984); Lewis, "*New York Times v. Sullivan* Reconsidered: Time to Return to 'The Central Meaning of The

First Amendment'," 83 Colum.L.Rev. 603 (1983); Mayton, "Seditious Libel and the Lost Guarantee of Freedom of Expression," 84 Colum.L.Rev. 91 (1984); Redish, *supra;* Schauer, "Language, Truth, and the First Amendment: An Essay in Memory of Harry Canter," 64 Va.L.Rev. 263 (1978); Shiffin, "Defamatory Non-Media Speech and the First Amendment Methodology," 25 U.C.L.A.L.Rev. 915 (1978); Stewart, "Or of the Press," 26 Hastings L.J. 631 (1975); Wellington, "On Freedom of Expression," 88 Yale L.J. 1105 (1979). A number of these scholars recognize that the expansion of the *New York Times* standard to public figures and the rejection of the public interest test developed in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) is not consistent with the First Amendment theory of *New York Times v. Sullivan, supra. E.G.,* Schauer, "Public Figures," 25 William & Mary L.Rev. 905, 908, 919 (1984). If the First Amendment protects expressions only designed to facilitate the political process by creating an informed citizenry, then private communications concerning private subjects would be unprotected—whether made in the form of an opinion or a statement of fact. Of course, the common law could always provide protection.

The dominant view today suggests that the First Amendment encompasses more than mere political expression. Although the level of protection often varies, it seems clear that the First Amendment protects at least the flow of information on political, economic and social issues. *See generally Abood v. Detroit Board of Education*, 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977); *Virginia Board v. Virginia Consumer Council*, 425 U.S. 748, 765, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976). For example, the Supreme Court has placed commercial speech within the sphere of the First Amendment. *See e.g. Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). *See generally* Schiro, "Commercial Speech: The Demise of A Chimera," 1976 Sup.Ct. Rev. 45. In *Connick v. Myers*, the Supreme Court observed:

The First Amendment does not protect speech and assembly only to the extent that it can be characterized as political. "Great secular causes with smaller ones are guarded." We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the state can prohibit and punish such expression by all persons in its jurisdiction. For example, an employee's false

criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street.

*Connick v. Myers, supra,* 461 U.S. at 147, 103 S.Ct. at 1690 (citations omitted and quoting in part from *United States Mine Workers v. Illinois State Bar Association,* 389 U.S. 217, 223, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)). And, in *Bose Corp. v. Consumers Union of U.S., Inc., supra,* where the Court suggested that the freedom of speech embraces a concept of individual liberty, the *New York Times v. Sullivan* standard was applied to a case involving a critical review of a stereo speaker system. The First Amendment protection of opinions, therefore, has been applied by lower courts to cases ranging from sports to restaurants, although usually involving a media defendant.[19]

Consequently, we believe that the First Amendment's absolute privilege for the expression of opinions encompasses more than political speech or the range of communications traditionally considered under the fair comment doctrine. Respondent's column, portions of which are alleged to be defamatory, was in its initial publication a matter of public importance and was in its republication a matter of particular importance to the recipient.[20] If

**19.** *See e.g., Mr. Chow of New York v. Ste. Jour Azur,* 759 F.2d 219 (2nd Cir.1985) (restaurant review); *Lewis v. Time Inc.,* 710 F.2d 549 (9th Cir.1983) (lawyer's ethics); *Hammerhead Enterprises, Inc. v. Brezenhoff,* 707 F.2d 33 (2nd Cir. 1983), *cert. denied,* — U.S. —, 104 S.Ct. 237, 78 L.Ed.2d 228 (controversial game); *Avins v. White,* 627 F.2d 637 (3rd Cir.1980) (A.B.A. accreditation report); *Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (shopping mall swindle); *Smith v. McMullen,* 589 F.Supp. 642 (S.D.Tex.1984) (concerning sports figure); *Economy Carpets v. Better Business Bureau,* 361 So.2d 234 (La.App.1978), *cert. denied,* 440 U.S. 915, 99 S.Ct. 1231, 59 L.Ed.2d 464 (criticizing business' advertising and sales technique); *Mashburn v. Collin,* 355 So.2d 879 (La.1977) (restaurant review); *Myers v. Boston Magazine Co., Inc.,* 380 Mass. 336, 403 N.E.2d 376 (1980) (sports announcer); *Greer v. Columbus Monthly*

*Publishing Co.,* 4 Ohio App.3d 235, 448 N.E.2d 157 (1982) (restaurant review).

**20.** The guarantee of freedom of speech is often tempered by the need to protect society against false and misleading statements of fact and the risk of misrepresentation or undue influence. Where the common law has recognized a conditional privilege, including but not limited to the privilege for fair comment, the risk of protecting against a dishonestly held opinion is outweighed by both society's interest in the expression of the opinion and the individual's right to express his or her opinion, provided that the statement may be classified as an "opinion." The common law apparently developed the various qualified privileges because such statements, whether of fact or opinion, were believed to be of special political, economic or social importance, or because the flow of information to the recipient is of special importance

the alleged defamatory remarks can be characterized as "opinions," they should be subject to the First Amendment absolute privilege.

## IV

Virtually all courts considering the fact/opinion distinction, including our own courts of appeal, treat the matter as one of law to be decided by the trial judge. *See e.g., Davis v. Ross*, 754 F.2d 80, 85 (2nd Cir.1985); *Lauderback v. American Broadcasting Co.*, 741 F.2d 193, 196, n. 6 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Pritsker v. Brudney*, 389 Mass. 776, 452 N.E.2d 227, 229 (1983); *Anton v. St. Louis Suburban Newspapers, Inc.*, 598 S.W.2d 493, 499 (Mo.App.1980). "While courts are divided in their methods of distinguishing between assertions of fact and expressions of opinion, they are universally agreed that the task is a difficult one." *Ollman v. Evans*, 750 F.2d 970, 978 (D.C.Cir.1984). The Restatement (Second) of Torts § 566 provides that "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Courts frequently employ such an analysis. *See e.g., Lauderback v. American Broadcasting Co.*, 741 F.2d 193, 195 (8th Cir.1984); *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir.1983); *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 63 (2nd Cir.1980); *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2nd Cir.1977), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95; *Bucher v. Roberts*, 198 Colo. 1, 595 P.2d 239, 241 (1979); *Fleming v. Benzaquin*, 390 Mass. 175, 454 N.E.2d 95, 103–04 (1983); *Duchesnaye v. Munro Enterprises, Inc.*, 125 N.H. 244, 480 A.2d 123, 125 (1984); *Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583, 587 (1980). Decisions also often emphasize the degree to which an assertion cannot be proved false. *See e.g., Valentine v. C.B.S., Inc.*, 698 F.2d 430, 43 (11th Cir.1983);

*Pring v. Penthouse International, Ltd.*, 695 F.2d 438, *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (10th Cir. 1982) (need for factual representation); *Hotchner v. Castillo-Puche, supra*, at 913; *Miskovsky v. Oklahoma Publishing Co.*, 654 P.2d 587, 593 (Okla.1982). Other courts seem to stress the context in which the assertion was made. *E.g., Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1288 (5th Cir.1981).

Some courts suggest that the determination hinges upon a number of special factors. In *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781 (9th Cir.1980), the United States Court of Appeals for the Ninth Circuit stressed the importance of three factors.

First, it is established that words are not defamatory unless they are understood in a defamatory sense.... Thus, the words alone are not determinative; the facts surrounding the publication must also be considered.

A second factor to consider in determining the nature of a publication is that even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an "audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole...."

The final consideration in the fact/opinion analysis is the language of the allegedly defamatory statement.

*Id.* at 783–84 (citations omitted). The court further added that the statement should be examined "in its totality in the context in which it was uttered or published." *Id.* at 784. *See Church of Scientology of California v. Flynn*, 744 F.2d 694, 698 (9th Cir.1984); *Lewis v. Time Inc.*, 710 F.2d 549, 553 (9th Cir.1983). In a scholarly opinion by Judge Starr of the United States Court of Appeals for the District of Columbia, the court observed that formulating a test poses a dilemma because of the "richness and

in how the recipient arrives at decisions which

materially affect his or her interests.

diversity of language, as evidenced by the capacity of the same words to convey different meanings in different contexts." *Ollman v. Evans,* 750 F.2d 970, 977–78 (D.C.Cir.1984). He offered four critical factors as guides in making the distinction. First, courts should analyze the common usage or meaning of the alleged defamatory statements. Second, courts should "consider the statement's verifiability—is the statement capable of being objectively characterized as true or false?" *Id.* at 979. Third, statements should be considered in "the full context of the statement—the entire article or column, for example—inasmuch as other, unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content." *Id.* Fourth, the broader context in which the statement appears should be considered. *Id.* The United States Court of Appeals for the Second Circuit recently held that no clear test existed, but it suggested that factors such as those discussed by Judge Starr serve to guide courts in their determination. *Mr. Chow of New York v. Ste. Jour Azur,* 759 F.2d 219 (2nd Cir.1985).

Concurring in *Ollman,* Judge Bork questioned any attempt to set forth a simple, uniform approach. He rejected creating a sharp dichotomy between facts and opinions. Instead, he suggested that in difficult cases courts should look to the totality of the circumstances:

> The only solution to the problem libel actions pose would appear to be close judicial scrutiny to ensure that cases about types of speech and writing essential to a vigorous first amendment do not reach the jury. This requires a consideration of the totality of the circumstances that provide the context in which the statement occurs and which determine both its meaning and the extent to which making it actionable would burden freedom of speech or press.

*Ollman v. Evans, supra,* at 997 (Bork, J., concurring). Part of his inquiry would focus on weighing the particular First Amendment concerns implicated by the case. *Id.* at 994. This totality of the circumstances approach was recently quoted with approval in *Janklow v. Newsweek, Inc.,* 759 F.2d 644, 649 (8th Cir.1985).

 We agree with Judge Bork that, though the task may prove difficult in this developing area of the law, courts should look to the totality of the circumstances. "The importance of the totality of the circumstances test is that it looks to all relevant circumstances to determine whether a given statement is actionable." *Janklow v. Newsweek, Inc., supra,* at 649, n. 7. This approach includes but is not limited to those factors discussed by both Judge Starr and the Ninth Circuit in *Information Control Group, supra.* It is up to the trial judge in the first instance to determine whether the alleged statements are capable of being treated as assertions of fact, although the jury may decide that they were not so understood. *See Pease v. Telegraph Pub. Co. Inc.,* 121 N.H. 62, 426 A.2d 463, 465 (1981).

 Examining the totality of the circumstances is essential to determine whether an ordinary reader would have treated the statement as an opinion. For example, "[a]ny statement that may refer to criminal conduct must be examined in context in order to determine whether the reader would be left with the impression that plaintiff was being accused of a crime." *Kotlikoff v. The Community News, supra,* 444 A.2d at 1091. *See e.g., Cianci v. New Times Publishing Co., supra,* (implied that plaintiff committed rape and then paid off victim); *Catalano v. Pechus,* 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350, *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1980) (accusation of bribe); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977) (charging a judge with corruption). Or, the assertion may only suggest to the ordinary reader that the defendant disagrees with the plaintiff's conduct and used pejorative statements or vituperative language to in-

dicate his or her disapproval. *See e.g., Greenbelt Cooperative Publishing Assn. v. Bresler, supra,* (allegation of "blackmail" in context did not refer to criminal conduct); *Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir.1978) *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (reporter used strong language to characterize a shopping mall proposal for which plaintiff was indicted). Courts should also examine the statements themselves to determine whether they are too imprecise. *See e.g., Avins v. White,* 627 F.2d 637 (3rd Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1982) (broad criticism of law school and its faculty); *Buckley v. Littel,* 539 F.2d 882 (2nd Cir.1976) *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (calling someone a "fellow traveler" and "fascist"); *Cole v. Westinghouse Broadcasting Co., Inc.,* 386 Mass. 303, 435 N.E.2d 1021, *cert. denied,* 459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 603 (1982) (criticism that reporter engaged in poor reporting).

■ Our decision, then, as to whether the alleged defamatory remarks constitute statements of fact or expressions of opinion must be made not only on the basis of the words themselves, but after consideration of all relevant attending circumstances. Ordinarily such a determination would be made at a motion for summary judgment.[21] While this case comes to us on a motion to dismiss, the parties have treated the case as on summary judgment and we have an adequate record upon which a final determination can be made.[22]

Appellants aver that the remarks "that a certain insurance agent and general agent had acted with 'greed' for the purpose of 'fleecing a consumer,' and that said general agent was a fraud and twister" are actionable. Appellants' petition does not allege

that respondent incorrectly described the transaction surrounding the replacement of the life insurance policies, which appears in all but the last line of the second paragraph. It is important to note that the words were used in a column which appeared as the personal message of the President in the trade association's newsletter. The President was calling attention to the practice of replacing Whole Life Par with Whole Life Non-Par, which he thought objectionable. No person doing the alleged offensive transaction is named in the column. No one contends that the words as published in the original newsletter were actionable.

■ Appellants argue that the defamation lies in respondent's republication of the column by sending a copy of it to particular individuals. In oral argument before the Court, the parties virtually conceded that the words "the agents acted with greed" "to fleece a consumer" are permissible expressions of opinion. These words appear at the end of the second paragraph and are the author's opinion based upon the recited facts and his premise that replacing Whole Life Par with Whole Life Non-Par is bad for the consumer. We believe that these words were an expression of an opinion and so hold.

■ The words relied on most heavily by appellants are the words "fraud" and "twister." Unless it can be established that by the use of the words "fraud" or "twister" respondent was accusing appellants of having committed a specific crime, then the use of these words would be too imprecise, undefinable and no more actionable that the words "with greed" "to fleece a consumer."

---

21. This determination is separate from the practice of having a court decide on a motion to dismiss for failure to state a claim whether the words are defamatory per se or per quod. *E.g., Langworthy v. Pulitzer Publishing Co.,* 368 S.W.2d 385, 388–89 (Mo.1963). We need not decide the efficacy of this separate practice. *But cf.* Rule 55.20.

22. The focus of the parties' arguments centers on whether the alleged defamatory remarks, taken in context, constitute expressions of opinion. In their briefs before both this Court and the court of appeals and in oral argument, the parties have presented the Court with information contained in depositions.

Considering these words in light of all relevant circumstances, we believe that they are the author's opinion that one who does the described acts that the author deems objectionable is greedy, fleeces his customers and is a fraud and a twister (a term having uncomplimentary implications in the insurance industry).[23] It is clear from the context of these words that respondent is not charging the commission of any specific crime, and "broad, unfocused, wholly subjective comment[s]" [24] that do not suggest to the ordinary reader that the plaintiff committed a crime are not actionable. The law is well-settled that individuals may use pejorative or vituperative language when referring to another as long as they do not suggest specific criminal conduct, which would be a statement of fact. In *Lauderback v. American Broadcasting Co.,* for example, the defendant suggested that an insurance agent was a crook and a liar, but because these words did not indicate to the ordinary reader that the plaintiff was being charged with specific criminal conduct the court held such expressions protected. *Lauderback v. American Broadcasting Co.,* 741 F.2d 193, 196–97 (8th Cir.1984). Similarly, in *Greenbelt Cooperative Publishing Assn. v. Bresler,* the United States Supreme Court held that an allegation that someone committed "blackmail" was an opinion because under the circumstances the ordinary reader would not have concluded that the defendant was charging the plaintiff with having committed a crime. *Greenbelt Cooperative Publishing Assn. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). Without a further allegation of a misstatement of fact, suggesting that one is a fraud or a twister is to suggest at most an opinion on an individual's conduct and unless the words imply some unstated defamatory facts such expressions are protected. *See e.g., Lewis v. Time Inc.,* 710 F.2d 549 (9th Cir.1983). *See also Anton v. St. Louis Suburban Newspapers, Inc.,* 598 S.W.2d 493 (Mo.App.1980) (remark that lawyer engaged in "sleazy dealings" an expression of opinion).

Because respondent's statements, considered under the totality of the circumstances, are expressions of opinion, they are not actionable and the cause was properly dismissed.

The judgment of the trial court is affirmed.

HIGGINS, GUNN, BILLINGS, BLACKMAR and DONNELLY, JJ., concur.

RENDLEN, C.J., concurs in result.

APPENDIX A

PRESIDENT'S

MESSAGE

WM. K. HALLIBURTON,

C.L.U.

BELIEVE IT—OR NOT

Recently your Business Practices Committee ably headed by Jack Eggmann, CLU, was asked to arbitrate a case between two agents. The basic facts were as follows:

An agent went to an insured and replaced and/or twisted three life insurance policies. Policy # 1 was a $15,000 Whole Life-Par, 7 years old. Policy # 2 was a $10,000 Endowment at 65-Par, 5 years old, and Policy # 3 was a $25,000 Whole Life-Par, nearly 3 years old. The agent replaced these three contracts with a $70,000 Whole Life Non-Par. He said it would be better for the consumer. There was no comparison form left at time of sale. There was no affirmative answer on the application as to replac-

---

**23.** These words appear in the fifth paragraph of the column where respondent is no longer discussing the specific incident described in the second paragraph. This part of the column is a call to action, with respondent seeking reform in the insurance industry. However, it may be imputed that the words "fraud" and "twister" refer to the agents discussed in the second paragraph because here respondent is characterizing *all* who engage in the practice respondent finds objectionable.

**24.** *Lewis v. Time Inc.,* 710 F.2d 549, 554 (9th Cir.1983).

ing existing insurance. There was no effort on the part of the General Agent or Agent to conserve existing insurance. There was nothing but greed on the part of the Agent and General Agent to fleece a consumer for their own personal gain.

Now, believe it—or not, this General Agent feels your Business Practices Committee was biased because the committee recommended the insured keep his existing insurance. The General Agent told the consumer and the committee that people are "fools" to keep money in an insurance policy and let the companies make the money when they could cash in existing whole life and buy new whole life, and invest the cash value at 10% or more in an annuity product yet.

What can you do? Get involved. Write the Superintendent of Insurance, write to Al Sykes, Director of Consumer Affairs for the State of Missouri. Most important—contact your State legislators. Make them aware so they can legislate. As Jim Longley, CLU, Governor of Maine, who was elected as an INDEPENDENT said in addressing the MDRT, "One man can't do everything, one man can do anything, if he will get involved."

Let Jack Eggmann know if you have a twisting problem. Let's get the twisters and the frauds out of our association and certainly out of our business.

By the way, the General Agent has been in the business 12 years with three different companies; the Agent five years with three different companies. Believe it or not—BELIEVE IT—IT happened in 1975 in St. Louis, Missouri.