Mary Ann SMITH, d/b/a Smith's
Kennel, Appellant,

v.

The HUMANE SOCIETY OF the UNIT-
ED STATES and Missourians for the
Protection of Dogs, Respondents.

No. SC 95175

Supreme Court of Missouri,
en banc.

Opinion issued April 25, 2017

Rehearing Denied June 27, 2017

Stephen F. Gaunt, David L. Steelman, Steelman, Gaunt & Horsfield, Rolla, for Appellant.

Bernard J. Rhodes, Lathrop & Gage LLP, Kansas City, Bryan O. Wade, Ginger K. Gooch, Husch Blackwell LLP, Springfield, for Respondents.

Patricia Breckenridge, chief justice

Mary Ann Smith filed a petition against the Humane Society of the United States ("HSUS") and Missourians for the Protection of Dogs, alleging various statements made in documents related to the ballot initiative, the "Puppy Mill Cruelty Prevention Act," were defamatory and placed her in a false light. Specifically, Ms. Smith alleged the specific statements were defamatory because they falsely stated or implied her kennel was one of the worst "puppy mills" in Missouri, according to the research done by HSUS, had "atrocious" and "unconscionable" state and federal animal welfare violations, and had a variety of other specific animal welfare violations. Ms. Smith further alleged the statements placed her in a false light by misrepresenting the activities and conduct of both her and her kennel and by associating her kennel with those that had more severe animal welfare violations.

HSUS moved to dismiss, contending Ms. Smith could not maintain her defamation claims because the statements in the documents were "absolutely privileged opinions," because "ratings, rankings and grades are inherently subjective," and because Ms. Smith failed to plead any facts cognizable under a false light cause of action. Missourians for the Protection of Dogs joined the motion to dismiss filed by HSUS and further contended the claims against it should be dismissed because none of the statements in the various documents were attributable to them. The circuit court dismissed the petition on the motion filed by HSUS "for the reasons set forth in [d]efendant's motion." The circuit court did not rule on the separate ground for dismissal offered by Missourians for the Protection of Dogs.

Ms. Smith appeals, arguing that there is no absolute privilege for opinions and that she pleaded facts that, taken as true, entitled her to relief on her defamation and false light claims. Because none of the statements pleaded in the defamation claims were actionable as a matter of law and because she did not plead any facts cognizable in a false light claim, the circuit court did not err in dismissing the petition. The circuit court's judgment is affirmed.

### Factual and Procedural Background

On November 2, 2010, Missouri citizens were slated to vote on the ballot-initiative Proposition B, the "Puppy Mill Cruelty Prevention Act," advocated for by the Hu-

mane Society of Missouri and Missourians for the Protection of Dogs.[1] To urge voters to support the ballot initiative, on October 5, 2010, HSUS published a 27–page report titled "Missouri's Dirty Dozen: A report on some of the worst puppy mills in Missouri," as well as a four-page summary of the report. Both were paid for by Missourians for the Protection of Dogs. In conjunction with these reports, Missourians for the Protection of Dogs issued a news release and HSUS Chief Executive Officer Wayne Pacelle authored a short article that was circulated to e-mail subscribers of his blog.

In the introduction of the Dirty Dozen report, HSUS explained the purpose and methodology of the report:

> Researchers at The Humane Society of the United States (HSUS) have spent weeks poring over state and federal inspection reports, investigators' photographs, and enforcement records received via the Freedom of Information Act to compile a list of some of the worst puppy mills in Missouri, known as "Missouri's Dirty Dozen."

> The purpose of the report is to demonstrate current problems that could be addressed by the passage of Proposition B .... Under Proposition B, the Puppy Mill Cruelty Prevention Act, many of these dealers' horrific violations would be backed by stronger enforcement opportunities.

> All of the puppy mills on the Dirty Dozen list are licensed by the USDA, the state, or both .... Some sell puppies to pet stores and others over the Internet. One thing they have in common is atrocious violations of basic humane standards for the dogs in their care.

HSUS also explained how it selected the individual kennels included in the Dirty Dozen report:

> Missouri's Dirty Dozen were selected as examples of some of the worst licensed kennels in the state, based upon the number and severity of state and/or federal animal welfare violations. Availability of photographs to verify the conditions was also a factor in some cases. Some of the violations described in federal and state kennel inspection reports include thin-coated breeds like Italian greyhounds shivering in the cold in temperatures as low as 9–degrees, dogs with open oozing or bleeding sores, underweight dogs with their entire skeletal structures showing, and sick or dying puppies who had not been treated by a vet.

> One kennel made the list because it noted on a proposed USDA program of veterinary care that the owner intended to dispose of unwanted dogs "by clubbing the dogs" ....

The Dirty Dozen report then stated that Proposition B would address "many of these dealers' horrific violations" by creating "stronger enforcement" and more protections.

Following this introduction, the Dirty Dozen report included specific information about 12 kennels under the heading "The Dirty Dozen" and eight kennels under the heading "Dishonorable Mentions." The kennels were not numerically ranked, and no information was included regarding the order of entries. The entry for each kennel included the kennel's name, the owner or owners of the kennel, the kennel's current state or federal licenses, and information summarizing and quoting various animal welfare violations.

---

**1.** On December 28, 2009, the Missouri secretary of state certified the ballot title for the proposed ballot initiative. *State ex rel. Hu-* *mane Soc'y of Mo. v. Beetem,* 317 S.W.3d 669, 671 (Mo. App. W.D. 2010).

The Dirty Dozen report included Ms. Smith's kennel as one of the "Dirty Dozen." Her kennel was the sixth kennel on the list of 12. The entry read:

*A Decade of Problems*

Mary Ann Smith—Smith's Kennel

● —Salem, MO

● —USDA license: 43–A–2296—USDA licensed from Aug. 1996 through August 2011

● —MDA license #: 3258—MDA licensed through 2010

Smith's Kennel has a history of repeat USDA violations stretching back more than a decade, including citations for unsanitary conditions; dogs exposed to below-freezing temperatures or excessive heat without adequate shelter from the weather; dogs without enough cage space to turn and move around freely; pest and rodent infestations; injured and bleeding dogs, dogs with loose, bloody stools who had not been treated by a vet, and much more.

The entry also included direct quotations from the inspection reports. One or more dogs in her kennel had been reported as having cherry eye, interdigital cysts, extremely long toenails, bloody feces, green matter in their eyes, and hair loss. It was further reported that her outdoor facilities had little bedding for the dogs even during freezing temperatures. A 2008 inspection report stated the issues with her kennel "remain[ed] constant with each inspection and more issues ha[d] surfaced since the last inspection." The entry for Smith's Kennel contained no photographs. The summary report associated with the Dirty Dozen report summarized the introduction of the Dirty Dozen report and included the lists of the "Dirty Dozen" and "Dishonorable Mentions."

The news release issued in conjunction with the reports was titled: "Dog Advocates Release New Report on Missouri's 'Dirty Dozen,' Some of the State's Most Deplorable Puppy Mills: Missourians encouraged to vote 'Yes' on Proposition B to curb puppy mill cruelty." The news release announced the publication of the Dirty Dozen report, which it said included "some of the most deplorable puppy mills in the state[.]" It further stated that the "Dirty Dozen" were included in the report because they "repeatedly depriv[ed] dogs of the basics of humane care, such as food, shelter from the heat and cold and/or basic veterinary care ... and based in some cases on conditions seen in photographs taken by investigators earlier this year." The news release continued with a summary description of some of the specific violations of the first three "puppy mills" included in the Dirty Dozen report. The news release concluded by stating that Proposition B would stop the violations reported at the puppy mills, such as dogs being "crammed into small and filthy cages, denied veterinary care, exposed to extremes of heat and cold, and given no exercise or human affection." While the examples of the specific violations listed in the news release did not apply to each and every kennel in the report, some of the violations, such as a lack of shelter from the cold, did apply to Ms. Smith's kennel. Neither Ms. Smith's name nor the name of her kennel was included in the news release.

Mr. Pacelle also circulated an article titled "A Dozen More Reasons for Supporting Missouri's Prop B," following the release of the Dirty Dozen report. The article describes the report as a "painstakingly documented report synthesiz[ing] information gleaned from state and federal inspection reports, including enforcement records, animal care violations, and photographs" that "identified these Dirty Dozen puppy mills and eight dishonorable mentions." Like the news release, the article

detailed a few specific violations included in the Dirty Dozen report without mentioning the name of any specific kennel. The news release did not include Mrs. Smith's name nor the name of her kennel.

On November 2, 2010, Missouri voters passed Proposition B, which was to take effect in November 2011 as the Canine Mill Cruelty Prevention Act, section 273.345, RSMo Supp. 2011. Following the law's passage, state legislators almost immediately began to introduce bills to repeal or amend the act. This included legislation from Ms. Smith's son, Representative Jason Smith, who was the Missouri house majority whip. On March 9, 2011, the day after the Missouri Senate gave its preliminary approval to pass SB 113 to repeal the Act, HSUS published an updated 26–page report, titled "Update Report: Missouri's Dirty Dozen," along with an associated news release.

The updated Dirty Dozen report stated: "Most of the worst puppy mills in Missouri are still licensed ... indicating the ongoing need for the protections that Proposition B, The Puppy Mill Cruelty Prevention Act, will provide." The updated report listed the status of the kennels that had been designated as the "Dirty Dozen" and "Dishonorable Mentions" in the original report. It also included six new kennels. As before, the lists were not numerically ranked.

The individual entry for Ms. Smith's kennel was titled "Chronically Problematic Puppy Mill Linked to MO Lawmaker Currently Attacking Prop B." It listed her USDA and MDA licenses as active "despite ongoing repeat violations." The entry summarized the previous violations at her kennel, such as "unsanitary conditions; dogs exposed to below-freezing temperatures or excessive heat without adequate shelter from the weather; dogs without enough cage space to turn and move around freely; pest and rodent infesta-

tions; injured and bleeding dogs, dogs with loose, bloody stools who had not been treated by a vet, and much more." The updated report also included a photograph of a dog that was reported to have congenital health problems. It also noted her son "was once listed in state records as a co-owner of her kennel and has been an outspoken opponent of Proposition B." The updated Dirty Dozen report concluded with a synopsis of the act and the various bills that had been introduced to repeal or amend the act. It urged Missouri citizens to "make brief, polite phone calls to their state senator, representative, and governor to ask them to respect the will of the voters—by voting 'NO' on any bill that seeks to weaken or overturn Prop B."

On the same day, HSUS issued a news release announcing the updated report. The news release noted the preliminary passage of SB 113, stating, "leaders of the repeal effort repeatedly claimed on the Senate floor last night that licensed breeders are not a problem." The news release stated that, because many of the "worst puppy mills in the state are still licensed," Proposition B "must be allowed to take effect in November, as approved by Missouri voters, to address the cruelty." The news release noted, "[M]any [of the puppy mills are] still depriving dogs of the basics of humane care, such as shelter from the bitter cold, adequate food and water, and basic veterinary care for illness or injuries" and have a disregard for "even the most minimal humane care standards for dogs." As before, while not every violation listed in the news release applied to each kennel, some of the violations were applicable to Ms. Smith's kennel.

Ms. Smith sued HSUS and Missourians for the Protection of Dogs, alleging claims of defamation and false light. In her fourth amended petition, Ms. Smith alleged in Count I, defamation—negligence, that spe-

cific statements from the Dirty Dozen report, the October 5, 2010 news release, the article, the updated Dirty Dozen report, and the March 9, 2011 news release were "false, scandalous, and defamatory" and "falsely impl[ied] that there [were] other, undisclosed objective facts known to the [d]efendants which support[ed] the false statements made by defendants." Ms. Smith did not allege any of the statements reporting specific violations of her kennel were false. Rather, she claimed the Dirty Dozen report generally defamed her and placed her in a false light.

Ms. Smith specifically alleged the following statements were defamatory:

From the Dirty Dozen Report:

- Ms. Smith's kennel was one of the "Dirty Dozen."
- Ms. Smith's kennel was among "the worst puppy mills in Missouri."
- "Missouri's Dirty Dozen were selected as examples of some of the worst licensed kennels in the state, based upon the number and severity of state and/or federal animal welfare violations."
- The "availability of photographs to verify the conditions was also a factor [of being selected as one of the Dirty Dozen] in some cases."
- "One thing [the Dirty Dozen] have in common is atrocious violations of basic humane standards for dogs in their care."

From the October 5, 2010 news release:

- "These puppy mills were singled out from the hundreds of high-volume commercial breeders in Missouri for repeatedly depriving dogs of the basics of humane care, such as food, shelter from heat and cold and/or basic veterinary care according to state and/or federal inspection reports for each dealer[.]"

- "At puppy mills in Missouri, dogs are crammed into small and filthy cages, denied veterinary care, exposed to extremes of heat and cold, and given no exercise or human affection."
- "These puppy mills have an undeniable record of unconscionable violations of the minimal humane care standards in place, according to [HSUS's] study of their records."

From the article:

- "HSUS researchers identified these Dirty Dozen puppy mills and eight dishonorable mentions" and "[t]his painstakingly documented [Dirty Dozen report] synthesizes information gleaned from state and federal inspection reports, including enforcement records, animal care violations, and photographs, and reveals shocking abuses and mistreatment of dogs at the state[']s largest puppy mills."

From the updated Dirty Dozen report:

- "[M]ost of the worst puppy mills in Missouri are still licensed."
- "Mary Ann Smith, [of] Smith's Kennel, Salem" was one of the "worst puppy mills" still licensed.
- "Smith's Kennel remains both USDA licensed and MDA licensed through 2011 despite ongoing repeat violations."

From the March 9, 2011 news release:

- "Missourians for the Protection of Dogs released a new report today demonstrating major continuing problems in licensed puppy mills."
- "[M]any of the worst puppy mills in the state are still licensed and in business six months after their histories were made public [in the Dirty Dozen report][.]"
- "The licensed puppy mills identified in this [updated Dirty Dozen] report

have an undeniable record of flagrant disregard for even the most minimal humane care standards for dogs." ·

Count I further alleged defendants were negligent in publishing the statements because they failed "to conduct a full and complete investigation of:" (1) "[her] kennel;" (2) "the other dirty dozen dog kennels reference[d] in [the] report;" and (3) " 'the hundreds of high-volume commercial breeders in Missouri' referenced in [the] report." Ms. Smith alleged these statements damaged her reputation by depriving her dog kennel of "valuable business associations in the dog raising and selling business" and causing her "to suffer humiliation, embarrassment, hurt, mental anguish, pain and suffering and has and will in the future be deprived of public confidence and social and business associations."

Count II, defamation—false statements, contained the same allegation that the above statements were "false, scandalous, and defamatory" and "falsely impl[ied] that there [were] other, undisclosed objective facts known to [d]efendants which support[ed] the false statements made by defendants." In this count, however, Ms. Smith alleged defendants published the alleged defamatory statements "with knowledge that such statements were false or with reckless disregard for whether such statements were true or false at a time when the [d]efendants had doubts as to whether such statements were true." Because Ms. Smith alleged the defendants' actions were done "knowingly, intentionally, [and] in conscious disregard for and in reckless indifference to [her] interests and welfare," she requested punitive damages.

In Count III, invasion of privacy—false light, she alleged the above statements misrepresented Ms. Smith and her kennel with reckless disregard for the truth and placed her in a false light by falsely implying:

1) her kennel was a "puppy mill" and "was as bad as and engaged in the same conduct as the other kennels listed in the report" that had more severe state or federal animal welfare violations;

2) she "committed 'atrocious violations of basic humane care standards for the dogs in her care;' "

3) she was a cruel and inhumane person;

4) her dogs "developed interdigital cysts from being 'forced to stand continually on wire flooring;"

5) she and her kennel "were singled out from the hundreds of high volume commercial breeders in Missouri for repeatedly depriving dogs of the basics of human care, according to state and/or federal state inspection reports for each dealer;"

6) her kennel was "among the worst of the worst and repeatedly deprived dogs of the basics of humane care;"

7) her "dogs received little to no medical care, lived in squalid conditions with no exercise, socialization, or human interaction, and are confined inside cramped wire cages for life[,] ... crammed into small cramped cages, denied veterinary care, exposed to the extremes of heat and cold, and given no exercise or human affection;"

8) her kennel's "violations were 'horrific,' " and that the state and federal inspections reports of [her] and her kennel 'reveal[ed] shocking abuses and mistreatment of dogs;" and

9) regarding the updated report, implied that her kennel "continued to have violations similar to those in the original [report]."

Ms. Smith further alleged these statements placed her in a false light because they were made "in public without any acknowledgment of explanatory facts and circumstances which, when added to the facts recited in the reports and news releases, would naturally tend to create a less objectionable public opinion of [her] and her kennel."

Ms. Smith alleged the statements "contained unreasonable and highly objectionable publicity" regarding Ms. Smith and her kennel, placing her "in a false light [by] attribut[ing] to her characteristics, conduct or beliefs that are false," which was "highly offensive to a reasonable person." Ms. Smith alleged the defendants made the statements "in reckless[ ] disregard as to the[ir] falsity" with "knowledge that they misrepresented" Ms. Smith and her kennel or "with reckless disregard for whether they misrepresented [Ms. Smith] . . . at a time when Defendants had serious doubts as to whether such statements truthfully describe [Ms. Smith and her kennel]." Ms. Smith alleged injuries and damages from: "be[ing] deprived of valuable business associations in the dog raising and selling business;" having "her privacy invaded, her history, activities and beliefs misrepresented, and her right to be left alone [ ] compromised and degraded;" and present and future "mental anguish, emotional distress, as well as personal humiliation and embarrassment from the invasions of her privacy," which has and will require counseling and medical costs. Because Ms. Smith alleged the defendants' actions were done "knowingly, intentionally, in conscious disregard for and in reckless indifference to [her] interests and welfare," she also requested punitive damages.

HSUS moved to dismiss Ms. Smith's fourth amended petition for failure to state a claim upon which relief can be granted under Rule 55.27(a)(6). HSUS contended Ms. Smith could not maintain her defamation claims because the statements in the reports and associated documents were absolutely privileged "opinions" and because "ratings, rankings and grades are inherently subjective." HSUS argued Ms. Smith could not maintain her false light claim because her allegations under this claim were "untrue statements" that sounded in defamation or, in the alternative, were privileged as matters of legitimate public interest. Missourians for the Protection of Dogs joined the motion to dismiss. In addition, Missourians for the Protection of Dogs argued that Ms. Smith's claims against them should be dismissed because they did not write any of the statements in the documents.

The circuit court sustained the motion to dismiss filed by HSUS and joined by the Missourians for the Protection of Dogs "for the reasons set forth in [d]efendant's motion." The circuit court did not rule on the separate ground for dismissal offered by the Missourians for the Protection of Dogs. Ms. Smith appealed, contending that the circuit court erred in sustaining the defendants' motion to dismiss because there is no absolute privilege for opinions, and that she pleaded facts that, taken as true, entitled her to relief on both her defamation and false light claims. After an opinion by the court of appeals, this Court granted transfer. MO. CONST. art. V, sec. 10.

## Standard of Review

A judgment sustaining a motion to dismiss for failure to state a claim upon which relief can be granted is reviewed de novo. *Avery Contracting, LLC v. Niehaus*, 492 S.W.3d 159, 161–62 (Mo. banc 2016). "A motion to dismiss for failure to state a claim" is solely a test of "the adequacy of a plaintiff's petition." *Id.* at 162. Exhibits attached to the petition are reviewed as

part of the petition. Rule 55.12. The facts alleged in the petition are assumed to be true, and all reasonable inferences are liberally construed in favor of the plaintiff. *Avery*, 492 S.W.3d at 162. "[T]he petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case." *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 306 (Mo. banc 1993).

### No Actionable Defamation Claims Were Pleaded

Ms. Smith contends the statements in the reports, summaries, news releases, and article were not protected statements of "opinion," as HSUS and Missourians for the Protection of Dogs contend, but were or implied "false statements of fact" that are not constitutionally protected. Moreover, Ms. Smith contends the conclusion that her kennel was one of the "Dirty Dozen" was not "subjective" because "the report fail[ed] to state that the matter [was] only the Defendants' opinion" and instead relied on "underlying objective facts, both disclosed and undisclosed." HSUS and Missourians for the Protection of Dogs contend the statements are "absolutely privileged" statements of opinion and that "ratings, rankings, lists and grades are inherently subjective" and, therefore, cannot be the basis of a defamation claim.

 Defamation law protects an individual against harm to his or her reputation. *Henry v. Halliburton*, 690 S.W.2d 775, 779 (Mo. banc 1985). "[T]o prevail on a defamation claim," both public-figure and private-figure plaintiffs must prove "1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Farrow v. Saint Francis*

*Med. Ctr.*, 407 S.W.3d 579, 598–99 (Mo. banc 2013) (internal citations omitted).

 To determine whether a statement is defamatory, "the alleged defamatory words must be considered in context, giving them their plain and ordinarily understood meaning." *Nazeri*, 860 S.W.2d at 311. To allow the "breathing space" necessary for free expression and debate under the First Amendment, certain statements, such as statements of "opinion" not provable as false, cannot be the basis of a defamation claim. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Whether an alleged statement is capable of being treated as an opinion or as an assertion of fact is a question of law . . . ." *Nazeri*, 860 S.W.2d at 314.

As noted by the Supreme Court of the United States, the need to balance the protection of an individual's reputation with freedom of expression has shaped the boundaries of state defamation law insofar as these boundaries are contoured by constitutional guarantees of free speech and free press and the attendant commitment to maintain "uninhibited, robust, and wide-open" debate on public issues. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). As discussed in *New York Times*,

> The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and

that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.

. . . .

In *Cantwell v. Connecticut*, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940), the [Supreme] Court declared:

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.
>
> That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the breathing space that they need to survive.

376 U.S. at 269, 271, 84 S.Ct. 710 (internal quotations and citations omitted).

In light of these concerns with free expression, the Supreme Court has held there can be no liability under state defamation law for statements of opinion. *Gertz*, 418 U.S. at 339–40, 94 S.Ct. 2997. In *Gertz*, the Supreme Court stated: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* Following *Gertz*, Missouri adopted an absolute privilege for expres-

sions of opinion, broadly holding that any alleged defamatory statements that "can be characterized as 'opinions,'" are "subject to the First Amendment absolute privilege." *Henry*, 690 S.W.2d at 787.

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court clarified that *Gertz* was not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion'" because expressions of "opinion" may, in fact, "often imply an assertion of objective fact." But contrary to Ms. Smith's contention, *Milkovich* did not wholly abandon the constitutional protection for an "opinion."

The Supreme Court in *Milkovich* held that a statement labeled as an "opinion" can be the basis of an actionable defamation claim if the alleged "opinion" statement implies an assertion of objective facts. *Milkovich*, 497 U.S. at 18, 110 S.Ct. 2695. Accordingly, some statements about matters of public concern may not be protected "opinion" even if so labeled. *Id.* This does not mean, however, that all statements of opinion are actionable. *Id.* at 19, 110 S.Ct. 2695. To be liable under state defamation law, opinion statements about matters of public concern "must be provable as false." *Id.* If opinion statements are not provable as false, these statements are still protected. Notably, the Supreme Court in *Milkovich* also cited the holding in *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL—CIO v. Austin*, 418 U.S. 264, 284–286, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), that to safeguard free expression and public debate, words used as "rhetorical hyperbole," "lusty and imaginative expression[s] of [ ] contempt," and "loose" language cannot reasonably be interpreted as stating actual facts. *Id.* at 16–17, 110 S.Ct. 2695.

Three years after *Milkovich*, in *Nazeri*, 860 S.W.2d at 314, this Court recognized *Milkovich*'s rejection of an absolute privilege for "anything that might be labeled 'opinion.'" This Court further adopted the *Milkovich* "test" to determine whether a statement is actionable, holding that "[t]he test to be applied to an ostensible 'opinion' is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." *Id.* This Court again recognized this test in *Overcast v. Billings Mutual Insurance Co.*, 11 S.W.3d 62, 73 (Mo. banc 2000).

Turning to the specific allegations in her petition, Ms. Smith does not assert any of the state or federal violations attributed to her are false. Rather, she claims that including her kennel in the report as one of the "Dirty Dozen" and one of the "worst puppy mills in Missouri" is defamatory because it implies her kennel had more, and more severe, violations of federal or state animal welfare violations than other kennels in Missouri and because the general statements in the report about the 12 "puppy mills," which were based on the specific violations found during state and federal inspections of the "Dirty Dozen," imply the existence of objective facts that are false when applied to her kennel.

Ms. Smith contends the statements are actionable because HSUS and Missourians for the Protection of Dogs did not clearly state that they were giving opinions. *Milkovich*, however, does not require this. Instead, review is confined to whether, as a matter of law, the statements relating to public concerns are provable as false or could reasonably be interpreted as implying objective facts provable as false. *Milkovich*, 497 U.S. at 19, 110 S.Ct. 2695.

■ Ms. Smith first contends the statement that her kennel is a "puppy mill" is a factual statement that can be proven false. She asserts HSUS and Mis-

sourians for the Protection of Dogs defined "puppy mill" by including the following statement in the news release for the original report: "At puppy mills in Missouri, dogs are crammed into small and filthy cages, denied veterinary care, exposed to extremes of heat and cold, and given no exercise or human affection." Ms. Smith contends whether these conditions existed at Ms. Smith's kennel is a factual statement that can be proven or disproven.

■ In considering whether statements are defamatory, the "defamatory words must be considered in context." *Nazeri*, 860 S.W.2d at 311. Whether a statement alleged to be defamatory is actionable is a question of law. *Nazeri*, 860 S.W.2d at 314. The words in an allegedly defamatory statement must "be taken in the sense which is most obvious and natural and according to [the] ideas they are calculated to convey to those to whom they are addressed." *Id.* In context, as part of the news release for the original report, the sentence Ms. Smith contends is a "definition" of puppy mill is not intended as a definition. Considering the purpose of the news release to inform the public about the contents of the report, the allegedly defamatory statement is not a "definition" but is a description of a few of the violations found at the puppy mills. Importantly, neither this statement nor the news release as a whole states that these violations are applicable to Ms. Smith's kennel. In fact, neither Ms. Smith's name nor the name of her kennel is included in the news release.

■ Because the term "puppy mill" was not defined in the report, "[t]o determine the ordinary meaning of a term, this Court consults standard English language dictionaries." *Farmland Indus., Inc. v. Repub. Ins. Co.*, 941 S.W.2d 505, 508 (Mo. banc 1997). As such, a dictionary definition

of a "puppy mill" is "a commercial farming operation in which purebred dogs are raised in large numbers." Merriam Webster's Collegiate Dictionary 1010 (11th ed. 2009). As cited by Ms. Smith, another dictionary defines "puppy mill" as "[a]n establishment that breeds puppies for sale, typically on an intensive basis and in conditions regarded as inhumane." Oxford Living Dictionaries, https://en.oxford dictionaries.com/definition/puppy_farm. (last visited March 28, 2017).

Even if Ms. Smith is correct that the term "puppy mill" as used by HSUS and Missourians for the Protection of Dogs in the report has a negative connotation, a negative connotation alone does not make it actionable. As used in the report, the term "puppy mill" is imprecisely used as "rhetorical hyperbole" and a "lusty and imaginative expression of the contempt" of political advocates during a hotly contested political campaign that cannot, therefore, "reasonably [be] interpreted as stating actual facts." *Milkovich*, 497 U.S. at 16–17, 110 S.Ct. 2695 (quoting *Letter Carriers*, 418 U.S. at 284–86, 94 S.Ct. 2770); *see also Nazeri*, 860 S.W.2d at 314 (considering whether a term is too "imprecise" to be actionable). Accordingly, statements that Ms. Smith's kennel is a "puppy mill" are not actionable as a matter of law.

 Ms. Smith further contends that including her kennel in a report of the "worst puppy mills in Missouri" implies her kennel had more, and more severe, federal or state animal welfare violations than other kennels in Missouri. This contention presupposes, however, that whether her kennel had more "severe" violations than other kennels in Missouri is a statement that can be provable false by undisclosed *facts*. Whether Ms. Smith's kennel had *more* state or federal animal welfare violations than other kennels listed in the reports or other kennels licensed in Mis-

souri is an objective fact that is provable false. But in this case, this alone does not make her defamation claims actionable.

While the report lists this as one reason a kennel may have been included in the report, the report does not state Ms. Smith's kennel was included solely based on the number of violations. Instead, the report states that kennels were chosen based on the "number" *and* the "severity" of the violations, repeated violations over a period of time, as well as, "in some cases," the availability of photographs. The "severity" of a kennel's violations is, however, subjective and is not provable as false. A ranking or list, which includes the subjective interpretation of data, leads to subjective conclusions that cannot be provable as false. *See, e.g., Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 242–43 (Mo. App. E.D. 2011) (company's Better Business Bureau rating based on a subjective interpretation of data and not actionable as a matter of law); *see also Seaton v. TripAdvisor LLC*, 728 F.3d 592, 600 (6th Cir. 2013) (hotel's inclusion on a list of "dirtiest" hotels not a provable fact because term "dirtiest" is hyperbolic and "inherently subjective"); *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) ("junk" credit rating based on a subjective and discretionary weighing of factors not provable false).

Unlike the "number" of violations, which can be quantified, the "severity" of a kennel's violations is based purely on a subjective assessment. Likewise, while the report may not have included the violations from every kennel HSUS researched, these undisclosed violations cannot be proven false because whether they are more "severe" than Ms. Smith's violations cannot be objectively assessed. Accordingly, whether Ms. Smith's kennel was one of the "Dirty Dozen" or one of "the worst licensed ken-

nels in the state" is a subjective assessment based on the "number" *and* the "severity" of her kennel's state and federal violations, which is not provable as false, and, therefore, as a matter of law does not present a basis for an actionable defamation claim.[2]

Moreover, the specific statements Ms. Smith objects to are not, in fact, those statements specifically referring to her kennel but are instead statements generally about the conduct of the "Dirty Dozen." These statements aggregated some of the specific violations found and, while not every violation was applicable to each kennel, some of the specific violations were, in fact, applicable to Ms. Smith.

But considering these statements in "the sense which is most obvious and natural and according to [the] ideas they are calculated to convey to those to whom they are addressed," *Nazeri*, 860 S.W.2d at 311 (internal quotations omitted), the list of conduct found to be, for example, "inhumane," did not apply to all 12 kennels. Because specific violations were listed for each kennel, statements about the conduct of the "Dirty Dozen" are clearly not intended to apply to each and every kennel.

Likewise, the general statements that the kennels included in the report had "atrocious violations of basic humane standards," "unconscionable violations of minimal humane care standards," "major continuing problems," and an "undeniable record of flagrant disregard for even the most minimal humane care standards" are not objective facts and do not imply objective facts provable as false. What is an "atrocious," "unconscionable," "major," or "flagrant" violation is purely subjective.

Additionally, in the context of a disputed ballot initiative, these words are the kind of "lusty, imaginative expression[s] of [ ] contempt" that cannot "reasonably [be] interpreted as stating actual facts[.]" *Milkovich*, 497 U.S. at 17, 110 S.Ct. 2695 (quoting *Letter Carriers*, 418 U.S. at 284–86, 94 S.Ct. 2770). For example, in *Letter Carriers*, 418 U.S. at 284–86, 94 S.Ct. 2770, the Supreme Court held the use of the word "traitor" was not actionable when it was used amidst a labor dispute, was used "in a loose, figurative sense," and was "merely rhetorical hyperbole" and a "a lusty and imaginative expression of [ ] contempt." *See also Greenbelt Co-op. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). The Supreme Court held that "provid[ing] protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual ... provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695 (internal quotations and citations omitted).

Because whether Ms. Smith's kennel had more "severe" animal welfare violations than other kennels was a subjective assessment not provable as false and did not imply any objective facts provable as false, these statements are not actionable as a matter of law. Moreover, statements that her kennel had "atrocious," "unconscionable," "major," and "flagrant" violations and statements that her kennel was a "puppy mill" do not include or imply objective facts that are provable as false because they reflect a subjective interpretation of data. Ms. Smith's petition did not allege any actionable statements and the

---

**2.** Additionally, insofar as Ms. Smith suggests that her kennel was included in the report as one of the "Dirty Dozen" due to her son's opposition to Proposition B and not because her kennel was one of the "worst," this assertion does not affect the determination that the statements in the report were subjective and, therefore, not provable as false.

803

circuit court did not err in dismissing her defamation claims.

## No Cognizable False Light Claim Was Pleaded

■ This Court has not previously recognized the tort of false light invasion of privacy as a cause of action. Ms. Smith notes the court of appeals recognized false light as a cause of action in *Meyerkord v. Zipatoni Co.*, 276 S.W.3d 319, 323 (Mo. App. E.D. 2008), as have 32 states and the District of Columbia.

Ms. Smith contends she has pleaded factual allegations sufficient to establish a false light invasion of privacy action. In particular, she argues her false light claim does not replicate her defamation claims because it is "based on the false implications of the context of the report, not particular false statements." Accordingly, she maintains that "even if the factual statements in the report are, taken individually, accurate," the "misleading context of the 'Dirty Dozen' reports and news releases attributes to Plaintiff[ ] characteristics, conduct, or beliefs that are false" and, therefore, places her and her kennel "before the public in a false position," depriving her dog kennel of valuable business associations and degrading and compromising her right to be left alone. Ms. Smith, however, also asserts such "false implications" in her defamation claims.

■ This Court has refused to recognize false light invasion of privacy claims when the claim "is nothing more than the classic defamation action where one party alleges that the other published a false accusation concerning a statement of fact." *Sullivan v. Pulitzer Broad. Co.*, 709 S.W.2d 475, 480–81 (Mo. banc 1986); *see also Farrow*, 407 S.W.3d at 600. "Recovery for untrue statements that cause injury to reputation should be defamation." *Nazeri*, 860 S.W.2d at 317. A claim for false light invasion of privacy is properly dismissed if recovery should be in defamation. *Id.* at 317.

Although this Court has refused to recognize a false light invasion of privacy claim, in *Sullivan*, this Court acknowledged:

It may be possible that in the future Missouri courts will be presented with an appropriate case justifying our recognition of the tort of 'false light invasion of privacy.' The classic case is when one publicly attributes to the plaintiff some opinion or utterance, whether harmful or not, that is false, such as claiming that the plaintiff wrote a poem, article or book which plaintiff did not in fact write. Another situation, although possibly actionable under defamation law, is when one uses another's likeness in connection with a story that has no bearing on the plaintiff.

709 S.W.2d at 480 (internal citations omitted).

In *Meyerkord*, the case Ms. Smith urges this Court to follow, a corporation's former employee was listed as the registrant for a website that was used during a viral marketing campaign. 276 S.W.3d at 321. The viral marketing campaign and the former employee subsequently became the subject of public "concern, suspicion, and accusations." *Id.* The employee filed a false light invasion of privacy action because the former employer failed to remove his name as the registrant, causing injury to his reputation and standing in the community. *Id.* at 321–22. The court of appeals held the facts presented were dissimilar to those in a defamation case and, therefore, "properly present the issue of false light invasion of privacy." *Id.* at 325. The facts in *Meyerkord*, however, are inapposite to the facts in the case at bar.

In her petition, Ms. Smith alleges the report placed her in a false light because it falsely implied her dogs "developed interdigital cysts from being forced to stand continually on wire flooring," falsely implied her kennel "continued to have violations similar to those in the original [report]," and falsely implied her dogs "received little to no medical care, lived in squalid conditions with no exercise, socialization or human interaction, and are confined inside cramped wire cages for life[,] ... [and] exposed to extremes of heat and cold." These allegations concern statements of fact or allegations of erroneous assessments of statements of fact. Accordingly, Ms. Smith should have, but did not, seek recovery for these allegedly untrue statements of fact in her defamation claims.

 Ms. Smith's petition further alleges the quotations from the state and federal animal welfare violation reports and the photograph of an allegedly "sick dog" were either "taken out of context" or "edited." Under a defamation claim, statements "imply a false assertion of fact" if they are "either incorrect *or* incomplete, *or* if [the] assessment of them *is* erroneous." *Milkovich*, 497 U.S. at 19, 110 S.Ct. 2695 (emphasis added). Ms. Smith's allegations assert the facts were presented in an incomplete or erroneous way. These allegations, therefore, imply false statements of fact that should have been, but were not, pleaded in her defamation claims. Accordingly, because Ms. Smith does not make any allegations cognizable as a false light invasion of privacy claim, it is not necessary for this Court to denominate a new cause of action for this tort at this time.

### Conclusion

The Dirty Dozen report stated Ms. Smith's kennel was included as "an example of some of the worst licensed kennels in the state" and was "singled out from hundreds of high-volume commercial breeders" based on the "number" and the "severity" of her kennel's state and federal violations. Because these statements were subjective assessments not provable as false and did not imply any objective facts provable as false, these statements are not actionable as defamation as a matter of law. Moreover, statements that her kennel had "atrocious," "unconscionable," "major," and "flagrant" violations and statements that her kennel was a "puppy mill" are not and do not imply objective facts that are provable as false and, instead, are imprecisely used as "lusty, imaginative expression[s] of [ ] contempt" that cannot "reasonably [be] interpreted as stating actual facts[.]" *Milkovich*, 497 U.S. at 17, 110 S.Ct. 2695 (quoting *Letter Carriers*, 418 U.S. at 284–86, 94 S.Ct. 2770). Accordingly, the circuit court did not err in dismissing Ms. Smith's defamation claims.

Additionally, because Ms. Smith does not make any allegations that would be cognizable as a false light invasion of privacy claim, the circuit court did not err in dismissing her false light invasion of privacy claim. The circuit court's judgment is affirmed.

Fischer, Stith, Draper, Wilson and Russell, JJ., concur.