William F. DIEZ, Plaintiff/Appellant,

v.

A.R. PEARSON, Defendant/Respondent.

No. 61018.

Missouri Court of Appeals,
Eastern District,
Division Four.

July 28, 1992.

Richard B. Dempsey, Daniel E. Leslie, Dempsey, Williamson & Piontek, Washington, for plaintiff/appellant.

Gael Davis Wood, James William McGettigan, Jr., Eckelkamp, Eckelkamp, Wood & Kuenzel, Washington, for defendant/respondent.

CRANE, Judge.

Plaintiff William F. Diez appeals the dismissal of his defamation action against defendant A.R. Pearson for failure to state a cause of action. We affirm on the ground that the allegedly defamatory statements were opinions which were privileged under the First Amendment.

Diez, a member of the County Commission of Franklin County, Missouri, filed a one count petition for defamation against Pearson, the Franklin County Assessor, alleging that in October, 1990, Pearson wrote and sent letters to Franklin County newspapers. He alleged that three of these letters, one of which was printed, contained defamatory matter and sought general damages. Pearson moved to dismiss on the grounds that the allegedly defamatory statements were opinions of the writer protected by the First Amendment to the United States Constitution. The trial court, applying *Henry v. Halliburton*, 690 S.W.2d 775 (Mo. banc 1985), sustained the motion to dismiss. Diez appeals from this order.

For his sole point on appeal Diez asserts that the trial court erred in sustaining the motion to dismiss without considering whether the statements were capable of having a defamatory meaning. Diez argues that statements contained in the letters falsely imputed to him the commission of a criminal offense and conduct incompatible with his office and thus constituted libel *per se* as defined in *Smith v.*

*UAW–CIO Fed. Credit Union,* 728 S.W.2d 679, 682 (Mo.App.1987).

We first examine the relevant portions of the letters containing the allegedly false statements. The first letter at issue is a four page, single spaced "Letter to The Editor" dated October 12, 1990 and entitled "True Story." It was sent to several newspapers and printed in one. In this letter Pearson related that in 1988 the County Commission had approved and signed the Assessor's budget, which contained the salaries of the Assessor's employees. He contended that when the budget was signed it became a valid contract. He further alleged that when the Assessor's employees time sheets were sent to the County Clerk's office for payment, the amounts on the time sheets were altered resulting in 18 employees receiving less pay. Pearson says that he took the matter up with the commission in 1988 and again in 1989. The commission initially refused to pay the employees, but later awarded the 18 employees back pay of $12,619.68. He reiterated that the budget was a valid contract, that changing the time sheets violated the contract and broke the law. He then asserted that the County Clerk and Diez had stated they did not know who changed the time sheets. He said that he did not know himself and if he did, he would prosecute. He concluded that the people of the county should know about the situation and that county officials should be accountable for their actions and the actions of their departments.

The next letter was a two page, single spaced letter dated October 19, 1990, addressed to The Washington Missourian. Apparently that newspaper had refused to print the October 12, 1990 letter. In his October 19, 1990 letter, Pearson criticized the paper for not printing his earlier letter and addressed the reasons the paper had given him for not printing the letter. He stresses he was not charging any person or group of persons with changing the time sheets and did not know who had changed the time sheets. He stated that his letter was not political and he had voted for various persons named in the letter. He again discussed the alteration of the 216 time sheets, characterized that action as "breaking the law," discussed the commission's initial refusal to give back pay, and accused the commission of "breaking the law" and "upholding that act."

The third letter was a two page, single spaced "Letter to The Editor" dated October 24, 1990 entitled "The Truth—Nothing But The Truth." This letter again set out the signing by the commissioner of the Assessor's 1988 budget, Pearson's contention that the signed budget constituted a contract with the Assessor's office, Pearson's contention that the contract was broken by the commission by the alteration of the time sheets, and the payment of back wages to the Assessor's employees in December of 1989. He reported that Diez and the county clerk denied knowing who changed the time sheets, but added that a commissioner had been quoted as saying that all three commissioners authorized the changes with Pearson's verbal agreement. Pearson denied he made such an agreement.

The parties agree that Diez was up for re-election in November, 1990.

In his brief Diez argues that certain statements in the letters falsely imputed to him the commission of a criminal offense. The specific statements referred to are as follows:

[From the October 19, 1990 letter]

"I do not understand why your paper is trying to protect those who broke the law in changing 216 time sheets over a 12 month period, thus shortchanging 18 employees of the assessor's office $12,-619.68 and the 1988 county commission upholding the action of the 1987 county commission."

\*     \*     \*     \*     \*     \*

[From the October 24, 1990 letter]

"This contract was broken by the county commission 216 times (18 times per month). The county commission did not notify the assessor, they just scratched a line through the time sheets in violation of the law....the county commission must live within the law like everyone else or suffer the consequences."

Diez also argues that the above statements and other statements falsely reflected on his ability to hold office by making him appear to be deceitful and a liar. The other statements were contained in the October 12, 1990 letter as follows:

"This is a story of lies and deceit and the actions of the 1988 County Commission and the 1988 County Clerk's Office;"

\* \* \* \* \* \*

"I know that the election of William F. Diez was a sad turn for Franklin County;"

\* \* \* \* \* \*

"Bill Diez, Presiding Commissioner, says he doesn't know who changed the time sheets, but he signs all checks and he's responsible for all contracts, but somebody knows who changed the 216 time sheets."

Diez asserts that the trial judge was required to and failed to first determine whether the statements were capable of a defamatory meaning citing *Halliburton*, 690 S.W.2d at 779. The simple answer to this contention is that, although the court dismissed on the grounds of absolute privilege, which is a defense to otherwise defamatory statements, the trial judge also determined that the statements were not defamatory. In his order the trial judge explicitly stated:

"It is the duty of the court (judge) in a libel suit to determine in the first instance, as a matter of law, whether a statement is capable of having a defamatory meaning. Only if it is, may a jury then have the opportunity to decide if the statement was, in fact, so understood.

\* \* \* \* \* \*

"The Supreme Court admonished that lower courts should examine statements themselves to determine whether they are too imprecise to be actionable as libel or slander. Broad, unfocused, wholly subjective comments that do not suggest to the ordinary reader that the plaintiff committed a crime are not actionable as libelous.

\* \* \* \* \* \*

"... None of the facts alleged, even if true, amount to any criminal offense or are *per se* defamatory."

Whether the statements were or were not capable of a defamatory meaning, the trial court did not err in dismissing the action on the grounds they were privileged opinions. Where the statements are claimed to be privileged as expressions of opinion under the First Amendment, it is up to the trial judge in the first instance to determine whether the alleged statements are capable of being treated as assertions of fact, and therefore unprivileged, or whether they are opinions and thus privileged. *Halliburton*, 690 S.W.2d at 788. The determination of whether an allegedly defamatory statement is opinion or fact is a question of law for the court. *Anton v. St. Louis Suburban Newspapers, Inc.*, 598 S.W.2d 493, 499 (Mo.App.1980). In distinguishing opinion from fact, the court must examine the totality of the circumstances to determine whether the ordinary reader would have treated the statement as an opinion. *Halliburton*, 690 S.W.2d at 788. A charge of specific criminal conduct would be a statement of fact. *Id.* at 790. A statement that refers to criminal conduct must be examined in context in order to determine whether the reader would be left with the impression that the plaintiff was being accused of a crime or that the defendant disagreed with the plaintiff's conduct and used pejorative statements or vituperative language to indicate his or her disapproval. *Id.* at 788–89.

In the context of the letters, it is clear the allegedly defamatory statements relating both to crimes and fitness for office are privileged opinions. They express Pearson's interpretation of the commission's conduct in the pay dispute. Whether the signed budget constituted a contract, whether the failure to pay the budgeted salaries constituted a breach of contract, whether the alteration of the time sheets broke the law, who was responsible for the alteration of the time sheets, and who should have known who altered them, are all expressions of Pearson's personal opinion. His conclusion that the activity constituted a story of lies and deceit and that Diez's election was a "sad turn" for the county are likewise expressions of opinion. These statements are inferences which cannot objectively and realistically be proven

true or false. The statements were made in the context of signed letters to the editor of a newspaper and not as a factual report to a reporter. The letters dealt with the conduct of various individuals in public office at a time when a general election was a few weeks away. Readers of the letters, who were newspaper editors, writers, and readers, would have been aware of the political context.

The letters do not charge Diez with a specific crime. In context, it is not even clear whether "the law" claimed to have been broken is an unspecified criminal law or merely the law of contracts. The letters are internally inconsistent on who Pearson thinks changed the time sheets. As a result the allegations are too imprecise to be actionable. *Halliburton,* 690 S.W.2d at 789. The use of strong language to show disapproval will not make the words actionable. *Id.* at 788–89.

■ These opinions, even if falsely and insincerely held, are constitutionally privileged if the facts supporting them are set forth. *Anton,* 598 S.W.2d at 499; *Matyska v. Stewart,* 801 S.W.2d 697, 701 (Mo.App. 1991). In this case Pearson set forth the facts upon which he based his opinion. The underlying facts (that a budget was signed, that time sheets were altered, that employees were originally not paid the amount budgeted, and that the commission eventually gave the employees back pay) standing apart from Pearson's inferences and interpretation do not defame Diez in any way. Further, the opinions do not imply that they were based on other, unpublished facts. The statements which Diez specifically complained of are opinions. The trial court properly sustained Pearson's motion to dismiss because the allegedly defamatory language was constitutionally protected.

The judgment of the trial court is affirmed.

CARL R. GAERTNER, P.J., and SIMON, J., concur.