

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| DEANN TOTTA, et al., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | WD86312 |
| | ) | |
| CCSB FINANCIAL CORP, et al., | ) | Filed: June 11, 2024 |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Clay County
The Honorable Timothy J. Flook, Judge**

**Before Division One: Lisa White Hardwick, P.J.,
and Alok Ahuja and Anthony Rex Gabbert, JJ.**

DeAnn Totta, Park GP, Inc., and Jefferson Acquisition, LLC (collectively "Totta") sued CCSB Financial Corp. and the members of its 2020 Board of Directors (collectively "CCSB") for defamation in the Circuit Court of Clay County. The circuit court granted CCSB's motion for summary judgment, and Totta appeals. Because the record establishes that the purportedly defamatory statements are either constitutionally protected statements of opinion, or are substantially true, we affirm the circuit court's grant of summary judgment to CCSB.

## Factual Background

Totta is an officer of Park and of Jefferson. Park is a CCSB shareholder. CCSB is the holding company for Clay County Savings Bank, a Missouri-

chartered financial institution. CCSB's stock is publicly traded in the over-the-counter market. At the times relevant to this litigation, Totta was not employed by or affiliated with CCSB, and did not have authorization to sign for CCSB.

In 2011, Totta obtained lists of the Non-Objecting Beneficial Owners ("NOBOs") of CCSB stock. NOBOs are shareholders who have agreed to permit financial intermediaries to disclose the shareholders' names and addresses to the securities' issuer. Totta obtained the NOBO lists for CCSB through Broadridge Financial Solutions, Inc. Broadridge is a third-party corporate and financial services firm which had been retained by CCSB to assist it with shareholder relations.

On three occasions in 2011, Totta filled out and submitted "NOBO Request Forms" to Broadridge, requesting a NOBO list for CCSB. In the first box on the NOBO Request Forms, Totta identified the "Company" as to whom information was requested as "CCSB Financial Corp," and provided CCSB's CUSIP number. The Request Forms named Totta as the requesting party, and identified her as a "VP" with Jefferson. The forms requested that the NOBO list be shipped and billed to Totta at Jefferson's address in North Kansas City. Directly above the box in which Totta's signature appeared, the forms stated: "***Request must be signed and dated by an authorized signer of the company***."

Although Totta was not then an authorized signer for CCSB, Broadridge sent her NOBO lists for CCSB in response to her requests.

Mario Usera is CCSB's President and a member of its Board. Before CCSB's 2012 shareholder meeting, Usera discovered that a representative of Jefferson and Park was communicating directly with CCSB shareholders to propose alternate candidates for CCSB's Board of Directors. Usera alerted

2

Broadridge.  On January 25, 2012, a Broadridge representative e-mailed Usera, and acknowledged that Broadridge had released NOBO information to Totta. The e-mail stated that Totta's NOBO request form "represented Deann Totta as the 'authorized signer of the company.'"

In a further e-mail on February 7, 2012, a Broadridge Vice President wrote to Usera "to again apologize for our unauthorized release of your company's Non-Objecting Beneficial Owner (NOBO) information."  The e-mail stated that the list had been the subject of an "unauthorized release of information" to Totta. Broadridge's e-mail stated that "[t]he Request Form was signed by Ms. Totta as an authorized, requesting signatory."  Broadridge stated that its standard procedure was to call an officer of the securities-issuing company to verify that the request for shareholder information was authentic, and was authorized.  In connection with Totta's request, however, Broadridge "incorrectly contacted Ms. Totta as the requestor, rather than [CCSB], as the issuing company, for validation of the requestor and shipping address."  Broadridge's February 7, 2012, e-mail also stated that it was "notifying Ms. Totta, as an unauthorized requestor of information, that she and/or her company are to destroy all NOBO lists obtained from Broadridge."

Broadridge separately corresponded with Totta, and provided copies of that correspondence to Usera.  In a letter dated February 14, 2012, a Broadridge Vice President wrote:

> Based on the NOBO Request Forms you submitted to Broadridge, we mistakenly provided you with unauthorized NOBO lists.
>
> As you are not an officer of CCSB, nor authorized to request a NOBO list on CCSB's behalf, you are now in receipt of confidential CCSB shareholder information.  As you know, the information

3

contained within the NOBO lists and media is deemed confidential information, contains personally identifiable information[,] and should be destroyed immediately.

The Broadridge Vice President sent a further letter to Totta on February 22, 2012, which repeated Broadridge's assertion that Totta's access to CCSB NOBO lists was unauthorized, and repeated its demand that Totta immediately destroy the lists, and all media on which information from the lists was stored. The February 22 letter noted that "[i]t has now come to our attention that an additional communication was sent to CCSB shareholders utilizing the NOBO information, after my voice mail and letter to you."

Totta did not respond to Broadridge's letters, and did not destroy the NOBO information, but instead maintained it for future use by Park and/or Jefferson.

CCSB held an election for two new board members at its annual shareholder meeting in late January 2020. In late 2019, CCSB's Board of Directors sent a proxy statement to shareholders recommending two individuals for election to the Board, who had been nominated by the Board's Nominating Committee. In response, Park issued a statement recommending two other candidates, one of whom was Totta.

On January 6, 2020, the Board sent a letter to the shareholders they believed had not yet voted in the election, which attached a report prepared by the Board's Nominating Committee. The letter and attached report contained information about the procedure for proxy voting; renewed the Board's recommendation of particular Board candidates; and responded to Park's proxy statement by opposing Park's nominees. At issue in this suit are the following

statements contained in the Nominating Committee report attached to the

Board's January 6, 2020 letter, opposing Totta's candidacy:

- In the case of Ms. Totta, the Company firmly believes she has committed fraud or, at the very least, misrepresented herself in attempts to obtain confidential shareholder information that should disqualify her from being a director of this Company. In 2011, Ms. Totta obtained the Company's Non-Objecting Beneficial Owner (NOBO) information directly through Broadridge Financial Solutions, Inc. Broadridge Financial Services [*sic*], Inc., had advised in a letter that she was provided with this list because she indicated on the form that she represented CCSB Financial Corp. She was subsequently told in writing by Broadridge Financial Services [*sic*], Inc., that she was in receipt of confidential shareholder information and was asked to return and destroy the information. The Company has not been able to verify that the information was destroyed or returned.

  . . . .

- The [Park] nominees and their affiliated entities have taken actions that have had an adverse financial impact on the Company, including past lawsuits against the Company and individually against former Chairman and Chief Executive Officer John Davis and current President and Chief Executive Officer Mario Usera. These lawsuits were dismissed by the courts without merit.

The first quoted paragraph included an embedded graphic depicting the

signature block of one of the NOBO Request Forms completed by Totta. The

graphic included the statement above the signature block that "***Request must

be signed and dated by an authorized signer of the company***."

Totta lost the January 2020 Board election. In March 2020, she sued

CCSB and its Board members for defamation based on statements in the

Nominating Committee report attached to the Board's January 6, 2020 letter to

shareholders. Totta's original petition asserted defamation claims based on the

statements concerning her acquisition of the NOBO lists in 2011 (referred to as

"Statements 1 and 2").  The individual named defendants were all of the members of CCSB's Board of Directors in January 2020:  Louis Freeman; David Feess; Mario Usera; George McKinley; Deborah Jones; Robert Durden; and Debra Coltman.  We refer to CCSB and the individual defendants collectively as "CCSB" in the remainder of this opinion.  Park and Jefferson were later added as additional plaintiffs; we refer to the plaintiffs collectively as "Totta" except where the context requires them to be distinguished.

Totta filed an amended petition adding a claim of defamation concerning the second paragraph quoted above, which asserted that she had participated in actions having an adverse financial impact on CCSB ("Statement 3").  In connection with Statement 3, the parties do not dispute that Totta was not personally a party to any lawsuits involving CCSB prior to the January 2020 Board election.  However, Jefferson and Park had been parties to one suit against CCSB, and Jefferson's managing member had filed another suit against CCSB.  The lawsuit filed by Jefferson's managing member involved, among other things, Totta's 2011 requests for CCSB NOBO lists.

The circuit court granted summary judgment to CCSB on all of Totta's defamation claims, and she appeals.

## Discussion

[T]his Court . . . reviews the grant of summary judgment *de novo*.  In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper.  Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law.  The facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment

6

motion. Only genuine disputes as to material facts preclude summary judgment. A material fact in the context of summary judgment is one from which the right to judgment flows. The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record.

*MacColl v. Mo. State Hwy. Patrol*, 665 S.W.3d 290, 293 (Mo. 2023) (cleaned up).

In order to prevail on a defamation claim, a plaintiff must show that a defamatory statement identifying the plaintiff was published; that the statement was false; that the statement damaged the plaintiff's reputation; and that the statement was published by the defendant with a culpable mental state. *Smith v. Humane Soc'y*, 519 S.W.3d 789, 798 (Mo. 2017) (citing *Farrow v. St. Francis Med. Ctr.*, 407 S.W.3d 579, 598-99 (Mo. 2013)); *State ex rel. BP Prods. N.A. Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. 2005). Whether language is defamatory is a legal question. *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 239 (Mo. App. E.D. 2011).

The alleged defamatory words must . . . be considered in context, and the words are given their plain and ordinarily understood meaning. The alleged defamatory words are taken in the sense which is most obvious and natural and according to the ideas they are calculated to convey to those to whom they are addressed.

*Id.* (cleaned up).

Under Missouri law, a defendant is not liable for defamation if their challenged statements are "substantially true," even though the statements may contain minor inaccuracies.

The test to be administered in evaluating the defense of truth is whether the challenged statement is substantially true. It is not necessary that the precise facts disclosed be literally true. Slight inaccuracies are immaterial if the allegedly defamatory charge is true

7

in substance.  A person is not bound to exact accuracy in his statements about another, if the statements are essentially true.  A substantially true statement contains the same "sting" as the truth, which means that the plaintiff's damage would have been the same irrespective of whether the defendant stated the truth or the substantial truth.

*Nigro v. St. Joseph Med. Ctr.*, 371 S.W.3d 808, 818 (Mo. App. W.D. 2012) (cleaned up); *see also*, *e.g.*, *SEMO Servs., Inc. v. BNSF Ry. Co.*, 660 S.W.3d 430, 437–38 (Mo. App. E.D. 2022).

Even if a statement might otherwise be deemed defamatory, the court must determine whether one or more privileges "shelters the defaming party from legal action."  *Pape v. Reither*, 918 S.W.2d 376, 380 (Mo. App. E.D. 1996).

**I.**

In her first and fourth Points, Totta challenges the circuit court's grant of summary judgment on what the parties have referred to as "Statement 1":  the statement that "[i]n the case of Ms. Totta, the Company firmly believes she has committed fraud or, at the very least, misrepresented herself in attempts to obtain confidential shareholder information that should disqualify her from being a director of this Company."  With respect to Statement 1, we need only address Totta's fourth Point, which challenges the circuit court's conclusion that Statement 1 was a privileged statement of opinion.

"The First Amendment's guarantee of freedom of speech makes expressions of opinion absolutely privileged.  Whether an alleged statement is capable of being treated as an opinion or as an assertion of fact is a question of law[.]"  *Nazeri v. Mo. Valley College*, 860 S.W.2d 303, 314 (Mo. 1993); *see also* *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 72 (Mo. 2000) ("the determination of whether the defense of absolute or qualified privilege exists is a

question for the court"). However, a statement framed as an "opinion" can be the basis of a defamation claim "when the statement of opinion implies the existence of undisclosed defamatory facts." *Castle Rock*, 354 S.W.3d at 241; *see also Smith v. Humane Society*, 519 S.W.3d 789, 799-800 (Mo. 2017) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)). Terms that constitute "imaginative expression" or "rhetorical hyperbole" are not generally defamatory. *Nazeri*, 860 S.W.2d at 314.

To determine whether an ordinary reader would treat the statement as an opinion, we examine the totality of the circumstances. *Henry v. Halliburton*, 690 S.W.2d 775, 788 (Mo. 1985). This includes analyzing the common usage or meaning of the statements, as well as the broader, situational context in which the statement appears. *Id.* For instance,

> apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole[.]

*Id.* at 787 (cleaned up). Moreover, even statements which ostensibly accuse another of criminal conduct may constitute statements of opinion, since – when viewed in context – such statements may be merely an assertion "that the defendant disagrees with the plaintiff's conduct and used pejorative statements or vituperative language to indicate his or her disapproval." *Id.* at 788-89; *see also Ribaudo v. Bauer*, 982 S.W.2d 701, 705 (Mo. App. E.D. 1998) ("'A statement that refers to criminal conduct must be examined in context in order to determine whether the reader would be left with the impression that the plaintiff was being accused of a crime or that the defendant disagreed with the plaintiff's

conduct and used pejorative statements or vituperative language to indicate his or her disapproval.'" (quoting *Diez v. Pearson*, 834 S.W.2d 250, 252 (Mo. App. E.D. 1992)).

*Henry* involved statements accusing an insurance agent of "act[ing] with greed" "to fleece a consumer," and alleging that the agent "was a fraud and a twister." 690 S.W.2d at 789. The Supreme Court held that, when viewed in context, the challenged statements were expressions of opinion which could not form the basis of a defamation claim. *Id.* at 790. The Court observed that "[t]he law is well-settled that individuals may use pejorative or vituperative language when referring to another as long as they do not suggest specific criminal conduct, which would be a statement of fact." *Id.*

Opinions are privileged where the speaker states the facts upon which the opinion is based, allowing the audience to form its own conclusions as to the opinion's accuracy. In *Diez*, 834 S.W.2d 250, the Court held that an individual's statements about a county commissioner were privileged opinion, even though the statements (in letters written to local newspapers) alleged "a story of lies and deceit" in which a county commissioner had "broke[n] the law," and had altered employees' time sheets to reduce their compensation "in violation of the law." *Id.* at 251-52. Among other things, the Court emphasized that the defendant's letters disclosed the facts upon which the writer based his belief that the county commissioner had broken and violated the law, and did not imply the existence of *additional* facts supporting those conclusions:

> In the context of the letters, it is clear the allegedly defamatory statements relating both to crimes and fitness for office are privileged opinions. They express Pearson's interpretation of the commission's conduct in the pay dispute. Whether the signed

budget constituted a contract, whether the failure to pay the budgeted salaries constituted a breach of contract, whether the alteration of the time sheets broke the law, who was responsible for the alteration of the time sheets, and who should have known who altered them, are all expressions of [the letter-writer's] personal opinion. . . .

These opinions, even if falsely and insincerely held, are constitutionally privileged if the facts supporting them are set forth. [*Anton v. St. Louis Suburban Newspapers, Inc.*, 598 S.W.2d 493, 499 (Mo. App. E.D. 1980)]; *Matyska v. Stewart*, 801 S.W.2d 697, 701 (Mo. App. E.D. 1991). In this case Pearson set forth the facts upon which he based his opinion. The underlying facts (that a budget was signed, that time sheets were altered, that employees were originally not paid the amount budgeted, and that the commission eventually gave the employees back pay) standing apart from Pearson's inferences and interpretation do not defame Diez in any way. Further, the opinions do not imply that they were based on other, unpublished facts.

*Id.* at 252-53.

Similarly, in *Iverson v. Crow*, 639 S.W.2d 118 (Mo. App. E.D. 1982), the Court held that a newsletter's claim that a subdivision's developer "continues to cloud the facts with half-truths, innuendo, distortion, and misrepresentation" was a protected expression of opinion. The Court explained that the expression of derogatory opinions was privileged where the speaker identified the facts underlying the opinion, allowing readers to evaluate the soundness of the speaker's opinions themselves:

If a defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion. *Restatement (Second) of Torts* § 566 illustration 5(1) (1976). *Anton v. St. Louis Suburban Newspapers, Inc.*, 598 S.W.2d 493, 498–99 (Mo. App.1980). These opinions are, even if falsely and insincerely held, constitutionally privileged if the facts supporting them are set forth. 598 S.W.2d at 499. The

11

rationale underlying this rule of law is that where the facts underlying the opinion are set forth in the article, the opinion is afforded privilege because each reader may draw his own conclusion to support or challenge the opinion. *Id.* Liability can be imposed only if the expression of opinion creates the reasonable inference of undisclosed defamatory facts as the basis for the opinion. *Id.*

*Iverson*, 639 S.W.2d at 119; *see also Anton*, 598 S.W.2d at 499 (statements that "this sleazy sleight-of-hand has been the work of Don Anton" and that "(r)esidents . . . are telling Walker, Anton and their bunch they want no part of these sleazy dealings" were privileged statements of opinion, where "defendants have set forth the facts upon which they based their opinions").

Comment c to § 566 of the Restatement (Second) of Torts, cited in *Iverson* and *Anton*, explains that "[a] simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." Illustrations 4 and 5 to Restatement § 566 provide examples of opinions which are not defamatory, because the facts on which the opinions are based are disclosed. Notably, Illustration 4 involves an opinion which is only tenuously supported by the underlying facts reported by the speaker; while Illustration 5 involves an opinion arguably accusing another of committing a crime:

> 4. A writes to B about his neighbor C: "He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic." The statement indicates the facts on which the expression of opinion was based and does not imply others. These facts are not defamatory and A is not liable for defamation.

>    5.    A says to B about C, a city official: "He and his wife took a trip on city business a month ago and he added her expenses in as a part of his own." B responds:  "If he did that he is really a thief." B's expression of opinion does not assert by implication any defamatory facts, and he is not liable to C for defamation.

When viewed in context, Statement 1 constitutes a privileged expression of opinion.  The statement was made in an attachment to a letter to shareholders during a contested Board election, and explained the Nominating Committee's view that Totta was not a suitable candidate for CCSB's Board of Directors.  Shareholders were aware that the statements were made in the context of a contested election, where the writers were attempting to advocate for a particular position or result.  *See Henry*, 690 S.W.2d at 789 (statements accusing insurance agent of "act[ing] with greed" "to fleece a consumer," and alleging that the agent "was a fraud and a twister," constituted privileged opinions); *Diez*, 834 S.W.2d at 252-53 (accusations that county commissioner had participated in "a story of lies and deceit," and had "broke[n] the law," were privileged opinions); *Iverson*, 639 S.W.2d at 119 (claim that a subdivision developer "continues to cloud the facts with half-truths, innuendo, distortion, and misrepresentation" was protected statement of opinion).

The Nominating Committee report discloses the facts underlying the Committee's belief that Totta had committed fraud or misrepresented herself; the report thus permitted recipients to decide for themselves whether CCSB's characterization of Totta's actions was accurate.  Indeed, Statement 1 was the topic sentence of a paragraph describing the facts on which the Nominating Committee's negative opinion of Totta was based.  And, as we discuss in § II below, the underlying factual statements were substantially true.  The paragraph in which Statement 1 appeared also included a graphical depiction of the portion

of the NOBO Request Forms in which (in the Nominating Committee's view) Totta misrepresented herself as an "authorized signer" for the company. Moreover, the Committee did not imply the existence of other, unpublished facts supporting its opinion that Totta had committed fraud or misrepresentation.

Totta argues that Statement 1 accused her of committing "fraud." Statement 1 states, however, that "the Company firmly believes she has committed fraud *or, at the very least*, misrepresented herself." (Emphasis added.) This statement, in the disjunctive, cannot be read to definitively accuse Totta of "fraud." "The disjunctive 'or' in its ordinary sense marks an alternative generally corresponding to the term 'either.'" *Piercy v. Mo. State Hwy. Patrol*, 583 S.W.3d 132, 141–42 (Mo. App. W.D. 2019) (additional quotation marks omitted); *accord*, *Freestone v. Bd. of Police Comm'rs*, 681 S.W.3d 602, 610 (Mo. App. W.D. 2023). But even if we accepted Totta's contention that Statement 1 accused her of committing "fraud," and her further contention that this was tantamount to an accusation of criminal conduct, it would still be a non-actionable opinion in the context of the January 2020 letter as a whole.

Totta also contends that Statement 1 is demonstrably false, when it states that she "attempt[ed] to obtain *confidential* shareholder information." (Emphasis added.) As explained in § II below, the Nominating Committee's report accurately stated that Totta only obtained the NOBO lists by "indicat[ing] on the [request] form that she represented CCSB"; that she was told by Broadridge "that she was in receipt of confidential shareholder information"; and that, because she was not an authorized recipient of the list, she "was asked to return and destroy the information." The facts described in the remainder of the

14

paragraph following Statement 1 adequately explained the basis for the assertion that Totta had attempted to obtain *confidential* information.

To support her claim that the NOBO lists were not *confidential*, Totta points to CCSB's bylaws, which authorized shareholders to review a shareholder list at CCSB's offices at least ten days prior to a shareholder meeting. Totta also cites to testimony of CCSB Director (and defendant-respondent) Debra Coltman, in which Coltman stated that, if CCSB had obtained a NOBO list, it would have made the list available to shareholders. Totta's argument suffers from multiple flaws. First, there is nothing in the record to suggest that Totta or Jefferson were CCSB shareholders; while Park was a CCSB shareholder, it was not identified in Totta's NOBO Request Forms. Therefore, even if CCSB's bylaws gave *shareholders* a right of access to information about *other* shareholders, that right would not extend to Totta or Jefferson. Further, the record does not indicate that Totta requested the information in the ten-day window provided by CCSB's bylaws. Finally, while CCSB may have made NOBO lists *in its possession* available to its shareholders on proper request, nothing in the record indicates that CCSB possessed the NOBO lists which Totta acquired directly from Broadridge. The Nominating Committee's assertion that Totta attempted to acquire "*confidential*" shareholder information cannot serve as the basis of a defamation claim.

Statement 1 was privileged opinion, and the circuit court did not err in granting CCSB summary judgment with respect to this statement. Points I and IV are denied.

## II.

In her second Point, Totta argues that the circuit court erroneously granted CCSB summary judgment concerning Statement 2, on the basis that the statement was substantially true.

"[T]ruth is an *absolute* defense to a defamation claim." *Nigro v. St. Joseph Med. Ctr.*, 371 S.W.3d 808, 818 (Mo. App. W.D. 2012); *see also Sterling v. Rust Comms.*, 113 S.W.3d 279, 283 (Mo. App. E.D. 2003) ("[f]alsity is an element of a prima facie defamation claim"). As explained above, we ask only whether the statements are *substantially* true, and ignore any slight inaccuracies. *Nigro*, 371 S.W.3d at 818.

Statement 2 appeared in the same paragraph of the Nominating Committee's report as Statement 1. Statement 2 asserted:

> In 2011, Ms. Totta obtained the Company's Non-Objecting Beneficial Owner (NOBO) information directly through Broadridge Financial Solutions, Inc. Broadridge Financial Services [*sic*], Inc. had advised in a letter that she was provided with this list because she indicated on the form that she represented CCSB Financial Corp.

Neither party disputes that Totta obtained the NOBO lists "directly through Broadridge." Therefore, the statement to which Totta actually objects is: "Broadridge . . . had advised in a letter that [Totta] was provided with this list because she indicated on the form that she represented CCSB."

In response to CCSB's summary judgment motion, Totta admitted that, in its February 7, 2012 letter to Usera, Broadridge "advised CCSB '[t]he Request Form was signed by [Totta] as an authorized, requesting signatory'"; she also admitted that, in the same letter, "Broadridge stated [Totta] was an unauthorized requester of the NOBO list." Totta also admitted that, in letters dated February 14 and February 22, 2012, Broadridge informed *her* that she had received

confidential CCSB information "because she represented on the form that she represented CCSB," and that she was not "authorized to request a NOBO list on CCSB's behalf." Totta admitted that Broadridge's letters asked her to destroy all data derived from the NOBO lists.

Separate from *Broadridge's characterization* of her actions, Totta also admitted in her response to CCSB's summary judgment motion that the NOBO Request Forms advised that the requests "must be signed and dated by an authorized signer of the company," and that she "was not an authorized signer of CCSB Financial Corp."

The facts which Totta admitted were sufficient to establish the substantial truth of the statement that "Broadridge . . . had advised in a letter that [Totta] was provided with this list because she indicated on the form that she represented CCSB Financial Corp."

Totta argues that Statement 2 is false, because it asserts that Broadridge *advised CCSB* that Totta received the lists based on a misrepresentation. She contends that the summary judgment record only reflects that Broadridge *advised her* that she had obtained the lists under false pretenses.

There are two defects in Totta's argument. First, the Nominating Committee's report did not assert specifically that Broadridge had *advised CCSB* that Totta had misrepresented her authority – the letter only states that "Broadridge . . . had advised" that Totta obtained the NOBO lists by indicating that she represented CCSB. This statement is true, whether Broadridge advised *Totta*, or advised *CCSB* directly. Further, Broadridge's communications *with CCSB* advised it, directly, that Totta signed the NOBO Request Forms "as an authorized, requesting signatory," and that she was an "unauthorized requester."

17

Moreover, the summary judgment record reflects that Broadridge provided Usera with copies of the February 14 and 22, 2012 letters which it sent to Totta, to demonstrate to Usera the actions Broadridge was taking to prevent Totta's exploitation of the NOBO information. Even if it were necessary for CCSB to establish what Broadridge *advised it*, the February 7, 2012 letter, and Broadridge's sharing of its letters to Totta with CCSB, are sufficient to establish the substantial truth of the statement that Broadridge had advised CCSB that it released the NOBO lists to Totta because she indicated that she represented CCSB.

Totta also argues that Statement 2 is false, because Broadridge advised Usera that *Broadridge* was responsible for the unauthorized disclosure of the NOBO information to Totta. Broadridge's February 7, 2012 e-mail to Usera explained that Totta signed the NOBO Request Forms "as an authorized, requesting signatory," although she was in fact "an unauthorized requestor of the information." Broadridge's e-mail apologized for permitting Totta to have unauthorized access to CCSB's NOBO information. The e-mail explained that, contrary to its standard operating procedures, Broadridge had erroneously contacted Totta, rather than CCSB, to verify the authenticity and authorization for Totta's requests.

Thus, Broadridge's February 7, 2012 email explained that its internal security procedures had failed to detect Totta's unauthorized request for the NOBO lists. Totta claims that, based on Broadridge's *mea culpa*, CCSB knew that the NOBO lists were provided to Totta because of Broadridge's mistake, *not* because of any misconduct by Totta. But Broadridge's acknowledgment of a mistake does not negate Totta's causal role in the disclosure of the NOBO lists. It

18

is a commonplace that "'[t]wo causes that combine' can constitute 'but for' causation." *Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. 2003) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. 1993)). As just one example of such "combined causation," a property owner may be held liable in certain circumstances for failing to protect persons on the property from the criminal conduct of third parties. *See*, *e.g.*, *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848-49 (Mo. 2018). While a property owner's failure to prevent criminal conduct may be *a* cause of a victim's injuries, this obviously does not negate the causal role of the criminals themselves. In the same fashion, while Broadridge may have negligently failed to prevent Totta from gaining unauthorized access to CCSB's NOBO lists, this does not negate the fact that it was *Totta* who made unauthorized requests for the information in the first place.

Totta argues in her briefing that, because the NOBO Request Forms she submitted to Broadridge clearly disclosed her affiliation with Jefferson, she did not misrepresent that she was authorized to act on behalf of CCSB. The fact that Totta identified her affiliation with Jefferson does not negate that she *also* represented that she was an "authorized signer" for CCSB. Totta does not contend that *only a CCSB employee* could be an "authorized signer" for the company. On the contrary, we presume CCSB's "authorized signers" could include outside directors employed by other companies, non-employee lawyers or accountants, or other non-CCSB employees. The fact that Totta identified herself as a Vice President of Jefferson does not counteract her representation that she was authorized by CCSB to request NOBO information.

Statement 2 is substantially true based on the uncontroverted facts in the record. Point II is denied.

19

**III.**

Totta also claims that the court erred in finding that Statement 3 was substantially true. She argues that, viewing the record in the light most favorable to her, Statement 3 was false because it could be read to mean that Totta herself had participated in lawsuits against CCSB that were dismissed without merit.

Statement 3 read:

> The nominees and their affiliated entities have taken actions that have had an adverse impact on [CCSB], including past lawsuits against [CCSB] and individually against former Chairman and Chief Executive Officer John Davis and Current President and Chief Executive Officer Mario Usera. These lawsuits were dismissed by the courts without merit.

The circuit court interpreted Statement 3 as stating only that Totta and affiliated entities had *taken adverse actions* against CCSB, but <u>not</u> that Totta and her affiliated entities had all *filed lawsuits* against CCSB. Totta argues that the court failed to interpret Statement 3 in the light most favorable to her. She contends that, on the most favorable reading, Statement 3 implied that both she and her affiliates had initiated litigation against CCSB. Such a statement would be false, since the parties agree that Totta had not personally participated in any litigation against the company.

While a summary judgment non-movant is entitled to the benefit of favorable inferences on *factual matters*, this does not mean that courts will afford the non-moving party the benefit of favorable *legal interpretations*. *See generally Willow Farm Pool & Homes Ass'n v. Zorn*, 676 S.W.3d 49, 54-55 (Mo. App. W.D. 2023) (interpreting the language of a restrictive covenant on appeal from a summary judgment motion); *Stacy v. Bar Plan Mut. Ins. Co.*, 621 S.W.3d

549, 562-63 (Mo. App. E.D. 2021) (interpreting the meaning of insurance contract provision in summary judgment context).

"Whether language is defamatory and actionable is a question of law." *Sterling v. Rust Commun.*, 113 S.W.3d 279, 281 (Mo. App. E.D. 2003); *see also Castle Rock*, 354 S.W.3d at 239. As such, courts must determine the plain meaning of purportedly defamatory statements to determine their character as a matter of law. *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 311 (Mo. 1993). Language is not ambiguous merely because parties disagree on its interpretation. *Woods of Somerset, LLC v. Devs. Surety and Indem. Co.*, 422 S.W.3d 330, 335 (Mo. App. W.D. 2013).

The plain meaning of Statement 3 refutes Totta's claim of falsity. The first clause of Statement 3 reads: "The nominees and their affiliated entities have taken actions that have had an adverse impact on" CCSB. "Actions" is a general term that encompasses any manner of conduct. *See* https://www.merriam-webster.com/dictionary/action (defining "action" simply as "a thing done : DEED"). Totta does not dispute that, by obtaining CCSB's NOBO lists in 2011, and thereby facilitating communication between dissidents and CCSB's shareholders, she took "actions that have had an adverse impact on" CCSB.

The remainder of Statement 3 states that the adverse actions of Totta and her affiliates "include[e] past lawsuits against" CCSB and its officers. This additional phrase does not imply that Totta was personally involved in lawsuits against CCSB or its officers. "'While the plain meaning of the word "include" may vary according to its context . . ., it is ordinarily used as a term of enlargement, rather than a term of limitation.'" *Short v. Southern Union Co.*, 372 S.W.3d 520, 532 (Mo. App. W.D. 2012) (quoting *State ex rel. Nixon v. Estes*, 108 S.W.3d 795,

21

800 (Mo. App. W.D. 2003)).  In a survey of earlier caselaw, *Short* concluded that "'include' in the context of statutes has almost universally been construed by Missouri courts as a term of enlargement, as providing an illustrative, non-exclusive example, or as both."  *Short*, 372 S.W.3d at 532.  A statement that certain items are "included" within a more general term does not mean that the general term comprehends <u>*only*</u> the listed items, or that the listed items are the *exclusive means* of falling within the general term.  *Id*. at 532-33.

In this case, the phrase "including past lawsuits" in Statement 3 does not serve to *limit* the term "actions" to lawsuits only – and it does not suggest that lawsuits constituted the <u>*only*</u> "adverse actions" taken by Totta and her affiliates. Therefore, the statement that Totta and her affiliates "have taken actions that have had an adverse impact on [CCSB], including past lawsuits" is not rendered false, even if Totta herself never participated in a lawsuit against CCSB or its officers.  Statement 3 does not imply that *every* listed party took *every* adverse action described.

The Missouri Supreme Court rejected an argument similar to Totta's in *Smith v. Humane Soc'y*, 519 S.W.3d 789 (Mo. 2017).  In *Smith*, a report prepared by the Humane Society identified what were characterized as Missouri's "Dirty Dozen" dog breeding facilities.  The report stated that "[s]ome of the violations described in federal and state kennel inspection reports include" specific types of mistreatment of animals.  *Id*. at 792.  One of the dog breeders identified as a member of the "Dirty Dozen" sued the Humane Society for defamation.  The plaintiff dog breeder contended (in part) that the Humane Society's report implied that her facility had committed the specific acts of misconduct attributed to the "Dirty Dozen."  The Supreme Court held that the challenged statement was

22

not actionable by the individual dog breeder, because the statement was "generally about the conduct of the 'Dirty Dozen,'" even though "not every violation was applicable to each kennel." *Id.* at 802. A similar analysis applies here.

The statement that *Totta's affiliates* had filed lawsuits against CCSB and its officers, and that those lawsuits had been "dismissed by the courts without merit," was substantially true. The parties agree that Totta's 2011 NOBO requests were the subject of a previous lawsuit in the Circuit Court of Jackson County, filed by Jefferson's managing member against CCSB officers. The circuit court entered summary judgment in favor of CCSB's officers. While the case was settled on appeal, the circuit court's judgment was not vacated. It is also undisputed that, in 2011, Jefferson and Park sued CCSB and some of its officers and directors. Once again, the circuit court granted summary judgment to the defendants; we affirmed that judgment on appeal. *Jefferson Acquisition, LLC v. CCSB Fin. Corp.*, No. WD75336, 406 S.W.3d 119 (Mo. App. W.D. Aug. 20, 2013) (*mem.*).

We recognize that Statement 3 did not explain that the suit by Jefferson's managing member was ultimately resolved by settlement; we also recognize that Statement 3 may not be precise in legal terms. Nevertheless, it is substantially true that courts "dismissed" both of Totta's affiliates' suits against CCSB based on a finding that the suits were "without merit."

Point III is denied.

## Conclusion

Because the statements on which Totta bases her defamation claims were privileged statements of opinion, or were substantially true, we affirm the circuit

23

court's grant of summary judgment to CCSB. Given our disposition, we need not address the other bases for the circuit court's judgment (such as its separate conclusion that the challenged statements were qualifiedly privileged).

_____
Alok Ahuja, Judge

All concur.